WILSON *v.* STORTHZ.

Opinion delivered March 22, 1915.

1.   WILLS—INTENTION OF TESTATOR—EVIDENCE TO EXPLAIN.—The testator's intention must be gathered from the will, and, while evidence may be received to explain any ambiguity in the designation of a beneficiary, yet neither the scrivener, nor any one else, however closely related to the testator, can be permitted to testify that the testator meant or intended any disposition of his property not expressed in the will.

2.   WILLS—EVIDENCE—INTEREST OF DEVISEES.—A testatrix devised certain property to her heirs, without naming them. A. and R., supposing themselves to be the only heirs, took said property and attempted to convey it. *Held*, evidence that the testator intended the property solely for A. and R. is admissible to show the interest claimed by A. and R., and what they purported to convey.

3.   ADVERSE POSSESSION—TITLE OF CLAIMANT.—Land was devised to the testator's heirs. A. and R. were regarded as the only heirs and deeded the land to S. *Held*, S. may set up title by adverse possession against other heirs of the testator, although he bought from A. and R. with the knowledge that there might be other heirs.

4.   DEEDS—INTEREST CONVEYED—RECITAL IN DEED—PRESUMPTION.—One entering upon the possession of land under a deed of conveyance to him is presumed to occupy and intends to claim only the interest named in his conveyance.

5.   DEEDS—DEED OF CO-TENANT—INTEREST CONVEYED—PRESUMPTION—ADVERSE HOLDING OF GRANTEE.—A. and R., two of a number of co-tenants of certain lands, under a will, deeded the land to S. without reciting in the deed the interest conveyed. *Held*, it then became a question of fact as to what interest the deeds were intended to convey, and what interest S. secured thereby, and the presumption is that as A. and R. did not, in fact, own the whole title, and consequently could not convey the whole title to him, that he entered as a co-tenant, and that his holding was not adverse to the other co-tenants.

6. ADVERSE POSSESSION—RIGHT OF CO-TENANT.—The grantee of the interest of one cotenant of certain lands, who held possession and claimed the whole interest, held to be adverse, under the evidence, to the interest of other cotenants of the said lands.

7. CONFLICT OF LAWS—INHERITANCE—REAL PROPERTY.—Inheritance is governed by the *lex rei sitae.*

8. DESCENT AND DISTRIBUTION—ILLEGITIMATE CHILDREN—NEGROES.—Under Kirby's Digest, § 2638, illegitimate children may inherit or transmit an inheritance, on the part of the mother, as if they were legitimate of their mother.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Charles C. Reid, Ashley Cockrill* and *H. M. Armistead,* for appellant.

The burden was upon appellees to prove adverse possession, commencing with all of its elements on or before August 1, 1904, and continuing with all of its elements for seven years. 80 Ark. 19; 65 Ark. 426; 42 N. E. 431; 46 So. 635; 84 N. E. 893; 107 Ark. 374.

The only attempt at proof of notoriety, Storthz' testimony that he told Harp at the time he purchased from Williams and Crusoe, that he was the sole owner, was inadmissible. 77 Ark. 309. There must have been actual notice to the other owners of such a declaration. 87 Ark. 496; 57 S. E. 769.

Attornment of occupiers to one co-owner will not start the statute. 30 S. W. 817; 49 Cal. 241; 29 Pac. 635; 92 Ark. 139. The suits filed by the women could not accomplish an ouster of the co-heirs. An ouster must be by taking possession.

The possession of Storthz can not be made to relate back to the date of the filing of those suits and thus become the adverse possession of the two women, because he held under deeds to undivided interests, and claimed that there were many co-heirs of the two women who were also owners. The co-heirs were not bound to take notice of the suits or the deeds. There must have been "actual notice, or notorious acts of an unequivocal character." 99 Ark. 451; 109 Ark. 281; 55 Ark. 109; 69 Ark. 95; 80 Ark. 444; 77 Ark. 201; 90 Ark. 149; 102 Ark. 611; 99 Ark. 84.

A deed to an undivided interest will not be color of title so as to support constructive possession. 73 Atl. 1025; 55 Ark. 109; 88 Ark. 318; 121 S. W. 552; 11 S. W. 779; 110 Ill. 609.

*W. T. Tucker,* for appellee Storthz.

1. The law does not require the occupying tenant to give notice of his exclusive claim to all others who were or might be interested in the title. Williams and Crusoe in this case took possession in 1900, as owners to the exclusion of all others, and denying that there were any other heirs. The record affirmatively shows that there was never a time when the alleged cotenancy of the appellant and his grantors was recognized or ever known. 57 Ark. 110; 20 Ark. 359, 374; 20 Ark. 557; *Id.* 508, 516; 33 Ark. 151; 154 S. W. (Tex.) 230; 102 Ark. 611, 615; 149 S. W. (Tex.) 218.

2. Appellant should not recover because his grantors had no inheritable blood, or at least none proved. It is proved that they were slave negroes born before the Civil War, and there is no proof that such negroes have any inheritable blood in North Carolina. 234 U. S. 615; 11 La. Ann. 232; 23 Miss. 170; 35 Fla. 39; 48 Am. St. 238; 6 Am. Dig. 2026; 98 N. C. 31; 49 La. Ann. 625; 183 Mass. 448.

*Coleman & Lewis* and *Miles & Wade,* for appellee Miles.

1. On the question of adverse possession, the presumptions are in favor of the findings of the chancellor, on appeal, and his findings will not be disturbed unless clearly contrary to the preponderance of the evidence. 95 Ark. 482; 73 Ark. 489.

It is apparent from the evidence that appellees and their grantor's, through their tenants were in actual and visible possession of the property for more than seven years. It was not necessary that appellees should have been in personal occupation of the land. Possession by a tenant inures to the benefit of the claimant of ownership and satisfies the condition of the statute. 1 Ruling

Case Law, § 42, and cases cited in note 18; 1 Cyc. 983; 75 Ark. 395. The law of attornment does not support appellant's contentions. 80 Ark. 435; 92 Ark. 35.

Appellant's grantors were ousted prior to August 1, 1904, and adverse possession began to run in favor of appellees and their grantors. 1 Ruling Case Law, § 43, and cases cited; 68 Mo. 164; 53 Neb. 156; 27 Neb. 47; 77 Ark. 201. Actual notice to a cotenant out of possession is not necessary to start the statute to running. 102 Ark. 611; 90 Ark. 149; 69 Ark. 562.

Williams and Crusoe went into possession adverse to appellant's grantors, and never recognized them as co-tenants. This amounted to a disseizin and started the statute of limitation. 67 Am. Dec. 733. The execution of deeds by them to Storthz amounted to an ouster, and he went into exclusive possession under adverse claim. 50 Ark. 152; 154 S. W. (Tex.) 230; 149 S. W. (Tex.) 218; 102 Ark. 611.

2. There is no merit in the contention that there is no privity or continuity of claim as to appellee Miles, and that there can be no tacking of successive possessions. The right to tack possessions under the circumstances shown by the record is well established. 86 Ark. 460; 67 Ark. 93; 98 Ark. 30; 106 Ark. 9; 97 Ark. 369; 71 Mo. 524; Wood on Limitations, § § 271-2. See, also, 14 Pa. St. 297; 24 Col. 252; 6 Watts (Pa.) 377; 101 Mo. 484; 67 Ark. 84; 97 Ark. 369; 1 Cyc. 1006, § 4.

3. If plaintiff is to recover anything, he should not, under the evidence, be permitted to recover the proportion awarded him by the chancellor.

4. The will gave the property to Ann Crusoe and Rosa Williams, and the chancellor should have so found. All the facts and circumstances surrounding the testator at the time she executed the will, as well as the testimony of Doctor Bentley and Evelyn West, go to show that she had only Ann and Rosa in mind and intended them to have the real estate. 49 Me. 288; 81 Ark. 235; 102 Ia. 322; Page on Wills, § § 365 and 514; Wigram on Wills, 263.

5. Grantors of appellant are illegitimate residents of North Carolina, and are not heirs of Tabitha Smith in Arkansas.

The act of February 6, 1867, does not benefit appellant because that law was enacted for negro citizens of Arkansas, and not for non-residents, and appellant does not establish facts sufficient to bring his grantors within the law if it had any application to them. See cases cited in Storthz brief, also 28 Ky. 460; 112 Ill. 234; 34 Pa. St. 126; 98 N. C. 31.

*C. C. Reid* and *Cockrill & Armistead,* for Wilson, on cross-appeal.

1. The will is not ambiguous and there was no necessity to resort to extraneous evidence in order to arrive at the testator's intention. The testimony of Doctor Bentley and Evelyn West was not admissible. 90 Ark. 154. The use of the word "heirs" in a will means all his heirs who would take according to the statute, and can not be limited by construction to particular heirs. 87 N. W. 564; 40 Cyc. 1459; *Id.* 1389; *Id.* 1412; 119 Ind. 254; 4 Ind. 519; 29 Gratton 9; 225 Pa. St. 574.

2. There is nothing in the record to warrant the conclusion that appellant's grantors are illegitimate; but their right to inherit is set at rest by this court's construction of the Acts of 1866 and 1867, and of Kirby's Dig., § 2638. 38 Ark. 487.

Smith, J. Tabitha Smith, a negro woman, died February 17, 1900, owning the lot situated at the corner of Ninth and Louisiana streets in the city of Little Rock, which constitutes the subject-matter of this lawsuit. There were three houses on the lot at the time of her death; she lived in one of them and rented the other two. She made a will on February 16, under which she gave to a niece certain personal property and devised her real estate, which consisted of the lot in controversy, to her heirs, with directions that the real estate be sold if the heirs did not agree, and that the proceeds of the sale be divided among them.

Tabitha's companion and close friend, one Evelyn West, was named as executrix, and qualified as such, and collected the rents until June 20, 1901, when she resigned, and one Joshua A. Harp, qualified as administrator, and collected the rents. He filed a final settlement April 3, 1902, but collected rents after his discharge as administrator.

Tabitha Smith was born a slave in North Carolina and was brought to Pulaski County two years before the war, and thereafter resided in said county until her death. A niece of Tabitha's, named Ann Crusoe, was brought to this State at the same time. In 1891, Tabitha returned to North Carolina to visit her relatives, and on her return brought back with her a grand-niece named Rosa Williams. Neither Ann Crusoe nor Rosa Williams was living with Tabitha at the time of her death, but they were soon advised of that fact and appeared on the scene as claimants of the entire estate as sole heirs, and as sole devisees under the will. Tabitha's relatives back in North Carolina were never advised of her death until 1910.

On July 24, 1903, Ann Crusoe conveyed "all my undivided interest" in the above-mentioned lot for the consideration of a thousand dollars to appellee Storthz, and on July 7, 1903, Storthz obtained a deed from Rosa Williams conveying "all my undivided interest" for the consideration of $300. In the meantime Harp had made final settlement of his administration and had been ordered to pay over, and had paid over, to Ann Crusoe and Rosa Williams the balance of rents in his hands. This payment was made to them upon the supposition that they were the only heirs of Tabitha Smith. Harp continued to collect rents after his discharge as administrator for the account of Ann and Rosa until Storthz's purchase, at which time he accounted to Storthz for the balance in his hands, and Parker & Ewing, rental agents, were given charge of the property and the tenants in possession were notified to thereafter pay rent to Parker & Ewing, and the rents were so paid.

On December 19, 1903, Ann Crusoe and Rosa Williams filed suits in the Pulaski chancery court against Storthz for the cancellation of their conveyances, and against Harp for an accounting for the rents. They alleged that Storthz had obtained deeds from them through fraud. On June 15, 1906, Ann Crusoe took a nonsuit, but she refiled the case and prosecuted it to a final decree. Both suits reached this court, and the result of the litigation was that Rosa Williams, recovered her interest, while Ann Crusoe was unsuccessful.

The pleadings in those cases, together with certain depositions then taken, were offered in evidence in this case, and from them it appears that one of the chief questions of fact involved in that litigation was the adequacy of the consideration paid by Storthz. Storthz testified in that case that he paid less than the property was worth, but as much as he could afford to pay in view of the uncertainty about the title. But there is no intimation in the record in either case that Storthz ever admitted he had bought less than the whole title, or that the deeds to him conveyed anything less than the whole title. He appeared to recognize the possibility that he had not acquired the whole title, but his grantors insisted they had conveyed the whole title and this was the interest which he thought he had purchased. The opening sentence in the opinion in the case of *Storthz* v. *Williams,* 86 Ark. 460, shows the supposed interest over which the parties were litigating and the construction placed by them upon the will of Tabitha Smith.

Appellee Miles, by mesne conveyances, acquired the interest of Rosa Williams and since August 4, 1908, has been the owner of that entire interest, and has had joint possession of the lot with his cotenant Storthz, since that date.

Justin Matthews, a real estate dealer in the city of Little Rock, undertook to purchase the lot from appellees, and secured an option from Miles for his undivided half for the consideration of $3,000, but failed to agree on terms with Storthz, because Storthz would not exe-

cute a warranty deed for his undivided interest for that consideration.

The proof shows the lot to be worth from twelve to twenty thousand dollars. After failing to buy the interest of appellees, Matthews looked up the heirs of Tabitha Smith and located them in North Carolina, and secured deeds from them during the months of March, April and May, 1911. The consideration paid for these deeds aggregated less than $400. These deeds were taken in the name of appellant, who brought this suit in ejectment on August 1, 1911, and, without objection, the cause was transferred to chancery, where the court held that all of appellant's grantor's were barred by the adverse possession of appellees, except those under the disability of coverture. The chancellor decreed twenty-nine fortieths to appellees, and eleven fortieths to appellant, and all parties have appealed from that decree.

(1-2) Proof was offered touching the proper construction to be given Tabitha Smith's will. Evelyn West, who knew more about Tabitha's affairs than any other person, testified that it was Tabitha's intention to give the entire property to Ann Crusoe and Rosa Williams; and she was corroborated by Doctor Bentley, who was the attending physician and who wrote the will. This evidence was, of course, inadmissible for this purpose. The testator's intention must be gathered from the will, and while evidence may be received to explain any ambiguity in the designation of a beneficiary, yet neither the scrivener, nor any one else, can be permitted to testify that the testator meant or intended any disposition of his property not expressed in the will. *Longer* v. *Beakley*, 106 Ark. 219. This evidence was admissible to show, however, the interest claimed by Ann Crusoe and Rosa Williams and the interest which they purported to convey to Storthz. *Jeffery* v. *Jeffery*, 87 Ark. 496; *Seawell* v. *Young*, 77 Ark. 309.

(3) Among other depositions offered in evidence, by agreement, which were taken in the former litigation were those of Ann Crusoe and Rosa Williams, in which

they each testified, that they were the only heirs of Tabitha Smith. And there were also other depositions in which it was stated that an abstract of title had been prepared and examined by lawyers of reputation and Tabitha's Smith title was approved, and Storthz received no intimation that Ann Crusoe and Rosa Williams were not the owners of the whole title, and it appears beyond any question, in fact without dispute, that Storthz claimed the entire lot subject only to the possibility that there might be some unknown heir who could claim an interest. After Storthz's purchase he exercised every act of ownership over the lot of which it was capable. Storthz's uncertainty about the existence of other heirs is not incompatible with his claim of adverse possession. One need not have a perfect title to set up that defense. Indeed, it may be made by one whose original entry was a trespass, and that is the theory upon which title by adverse possession is acquired. This adverse entry, or wrongful ouster, gives one a cause of action to dispossess the adverse occupant and if the suit be not commenced within seven years then it can not be maintained at all.

The proof of the proceedings in the probate court shows that all of the assets in the hands of the administrator were distributed to Ann Crusoe and Rosa Williams as sole heirs and as sole devisees of Tabitha Smith.

The property had gotten in very bad repair and it was found necessary to tear down one of these houses. Storthz repaired the other two and spent considerable money in having them papered, and for plumbing and for painting and whitewashing. He made other repairs about the premises, including the cleaning out of the cistern, and he complied with ordinances of the city in building cement sidewalks along both of the streets on which the lot fronted. And he paid all taxes and special assessments in his own name, as sole owner, until Miles acquired his interest, since which time these charges have been jointly paid by him and Miles.

The principal question in the case is whether or not, under this evidence, appellees can be heard to say

that their possession has been adverse to their cotenants, who were appellant's grantors. We are referred to the case of *Parsons* v. *Sharpe,* 102 Ark. 611, in which case the court said: " 'The conveyance by one cotenant of the entire estate gives color of title; and, if possession is taken, and the grantee claims title to the whole, it amounts to an ouster of the cotenants, and the possession of the grantee is adverse to them.' 1 Am. & Eng. Enc. of Law (2 ed.), p. 806, and numerous authorities there cited.

"That rule was recognized by this court in *Brown* v. *Bocquin,* 57 Ark. 97.

"On the other hand, the principle is well settled that where a conveyance is executed to a stranger by one tenant in common, purporting to convey only his undivided interest, he becomes a tenant in common with the other tenant (17 Am. & Eng. Enc. of Law, [2 ed.], p. 661; and, in order to constitute an ouster, 'the tenant out of possession must have actual notice of the adverse holding, or the hostile character of the possession must be so openly manifest that notice on his part will be presumed.' 1 Am. & Eng. Enc. of Law, (2 ed.), p. 805.

"The conveyance to appellant Parsons, being a conveyance only of the undivided interests of some of the tenants in common, falls within the latter rule, and is controlled by the case of *Singer* v. *Naron,* 99 Ark. 446, where we declared the law to be that 'in order for the possession of one tenant in common to be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to them directly, or by such notorious acts of an unequivocal character that notice may be presumed.' "

(4-5) It is true the deeds to Storthz did not recite that the interest conveyed was in each case an undivided half. Had this been done the opinion in the case of *Parsons* v. *Sharpe, supra,* would have been conclusive of this litigation. The rule is that one entering upon the possession of land under a deed of conveyance to him is presumed to occupy, and intends to claim only the interest

named in his conveyance. But, as the deeds to Storthz did not recite the interest therein conveyed; it became a question of fact as to what interest the deeds were intended to convey and what interest he secured thereby, and the presumption would be that, as his grantors did not, in fact, own the whole title, and, consequently could not convey the whole title to him, he entered as a cotenant, and that his holding was not adverse to the other cotenants.

There is a vast wealth of authorities on the right of one cotenant to claim adversely to another, and of the circumstances under which he will be held to have done so. But we need not go beyond the decisions of our own State to find a full discussion of the law on this subject. The case of *Singer* v. *Naron,* 99 Ark. 446, reviews a number of cases on this subject and concludes the discussion with the statement quoted in the case of *Parsons* v. *Sharpe, supra.*

(6) Does the evidence in this case meet the requirements set out in the cases cited? The chancellor found that it did, and we can not say that his finding is contrary to the preponderance of the evidence. The facts which we have recited show that there was never any question with Storthz about the interest which he had purchased, nor that his holding was adverse. It is true his cotenants received no actual notice of this adverse holding, but none could have been given them. Storthz was unaware of their existence. And when all the circumstances of this case are taken into account there appears to be such evidence of the adverse holding, as meets the requirements of the above cited cases. It is certain that Matthews knew of it long before he invested a dollar in this property, and while it is true that seven years have not expired since Matthews' attempt to purchase this lot, this is one of many circumstances which advised Matthews, and which in connection with all of the other circumstances, should have advised all others, of the adverse claim which appellees were making to the lot.

It is insisted there should be no recovery whatever here, for the alleged reason that the collateral kindred of Tabitha Smith can not inherit from her. It is urged that there were no valid marriages of slaves before the war, and that as slaves could not inherit at common law, no right of inheritance can be derived from one born a slave, except as such rights may have been given by statute. We are cited to the case of *Jones* v. *Jones*, 234 U. S. 615. The syllabus in that case is as follows:

"The surviving brothers and sisters of a colored freedman dying intestate, who were the children of a born slave and were themselves born slaves, are not denied the equal protection of the laws, contrary to U. S. Constitution, Fourteenth Amendment, by a decision of a State court construing Shannon's Comp. Tenn. Laws, § 4163, preferring the brothers and sisters of an intestate dying without issue over the husband or widow, as applying only to brothers and sisters born free, with the result that the intestate's real property acquired by him while he was a freedman passed to his widow under section 4165, which provides that if one dies intestate 'leaving no heirs at law capable of inheriting the real estate, it shall be inherited by the husband or wife in fee simple.' "

(7) The decision of that case turned, of course, upon the consideration of the laws of Tennessee, in which State the case originated. That case announced the well known rule that inheritance is governed by the *lex rei sitae*, and it was there said: "It (inheritance) is not a natural or absolute right, but the creation of statute law. If one claim the right to succeed to the real property of another, as heir, and his right is denied because he must trace his pedigree or title through an alien, a bastard, or a slave, the question is one to be determined by the local law."

(8) But we have had legislation on that subject, which Tennessee apparently has not had. Section 2638 of Kirby's Digest, is as follows: "Illegitimate children shall be capable of inheriting and transmitting an in-

heritance, on the part of their mother, in like manner as if they had been legitimate of their mother."

The proof is that all the heirs interested in this property trace their descent from Tabitha Smith's mother, who appears to have been twice married. The section of the Digest quoted was construed in the case of *Gregley* v. *Jackson,* 38 Ark. 487, where it was said: "But with regard to children professedly *illegitimate,* the same act provides that they shall be capable of inheriting and transmitting an inheritance *on the part of the mother,* 'in like manner as if they had been legitimate of their mother.' Legitimate children *of the mother* may transmit an inheritance to any and all collateral relations on the mother's side, who are of her blood, and so may her illegitimate children. This construction is too obvious to allow any serious consideration of the suggestion that the statute was meant to confine inheritance of illegitimate children to or from the mother, or through her in the direct ascending or descending line. 'On the part of the mother,' means on the mother's side of the genealogical tree. The effect of the old legislation was meant to be remedied to cure illegitimacy in the innocent. It amounted to this, that if there had been an actual marriage ceremony, the children should be legitimate for all purposes, although the marriage might be null. If it were a case of simple bastardy, the children were to be considered, nevertheless, upon the same ground with regard to heritable blood, as if the father were dead, leaving no blood relations. The father being supposed unknown, was simply ignored with all his blood, but no new laws of inheritance were intended, as to further line or limit."

In addition to the section of the Digest above quoted, we have an act, approved February 6, 1867, which is entitled, "An Act to declare the rights of persons of African descent." Section 3 of this act reads as follows:

"That all negroes and mulattoes who are now cohabiting as husband and wife, and recognizing each other as such, shall be deemed lawfully married from the pas-

sage of this act, and shall be subject to all the obligations, and entitled to all the rights pertaining to the marriage relation; and in all cases, where such persons now are, or have heretofore been so cohabiting, as husband and wife, and may have offspring recognized by them as their own, such offspring shall be deemed in all respects legitimate, as fully as if born in lawful wedlock." Act No. 35, of Acts of 1866-1867.

This act has never been carried into any Digest, yet it is discussed in the case of *Gregley* v. *Jackson, supra,* where it was said:

"Looking to its language, its remedial nature, and the circumstances of which the court can take cognizance, it would be a very narrow, and exceedingly literal, construction of this act to exclude from its scope those children, whose parents, although then dead, had cohabited as husband and wife, and recognized them as their offspring. The act is not in derogation of the common law. It is in aid of it—applying its rules of inheritance to what was really a new people, amongst whom there had been formerly no marriages, no property, nor any rules of inheritance whatever. It had in view the complete homologation of all *legal* rights of all classes in the State, as distinct from *political* rights—the latter coming through the Federal Constitution and acts of Congress.

"In any view of the case, whether considered simply as illegitimate children of one mother, or as Africans, the offspring of a former slave marriage, the brothers could inherit from each other, and Marshall Jackson, as held by the circuit court, became the heir of Jacob Keith."

It is also insisted that the court erred in holding that Emma Elliott, one of the heirs, inherited a one-eighth interest, when the court should have found that the said Emma Elliott owned a one-sixteenth interest. On the other hand, it is urged that appellant was not allowed to recover a sufficiently large interest, for the reason that certain of appellant's grantors were under the disability of minority prior to their conveyance. We have con-

sidered these questions and, without reviewing the evidence in support of the respective contentions, we have concluded that the chancellor's finding is not contrary to the clear preponderance of the evidence. The decree of the chancellor is, therefore, affirmed.