## WILSON v. BILES.

Opinion delivered July 12, 1926.

1. DESCENT AND DISTRIBUTION—NEGROES—LEGITIMACY.—In the absence of evidence that unmarried negro parents were cohabiting in the State as husband and wife when the act of February 6, 1867 (Crawford & Moses' Dig., § 7040) was passed, legalizing such cohabitation and legitimizing their children, was passed, their right to inherit from their father was not established.

2. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING.— A chancellor's finding of fact will not be set aside unless clearly against the weight of the evidence.

3. DESCENT AND DISTRIBUTION—FAILURE OF ISSUE—SURVIVING WIDOW.
—Under Crawford & Moses' Dig., § 3536, the widow of one who
left no children takes a fee simple in an undivided half of his
newly acquired land.

4. DEEDS—FORGERY—EVIDENCE.—In an action to quiet title, evidence
*held* to show that a deed to an intervener was a forgery.

5. ACKNOWLEDGMENT—PROOF OF FORGERY.—A certificate of acknowl-
edgment of a deed alleged to be a forgery does not preclude proof
of such forgery.

6. PRINCIPAL AND AGENT—ACCEPTANCE OF BENEFIT OF AGENT'S ACT.—
A grantee is bound by the representation of his agent who nego-
tiated a purchase of land that a deed would be made to the grantee
as trustee to perfect the title, whereupon the grantor would
convey title upon payment of an undetermined consideration.

7. VENDOR AND PURCHASER—MUTUALITY OF CONTRACT.—Where the
consideration to be paid for land was never agreed upon, the
minds of the parties never met.

8. EVIDENCE—CONSIDERATION OF DEED—PAROL EVIDENCE.—Parol evi-
dence of the consideration of a deed which recites a nominal
consideration is open to explanation by parol evidence.

9. VENDOR AND PURCHASER—INNOCENT PURCHASER.—The grantee in
a deed reciting that the grantor has no title to the land, on which
a *lis pendens* has been filed, is not an innocent purchaser.

10. VENDOR AND PURCHASER—FAILURE OF TITLE—REMEDY OF PUR-
CHASER.—Where the grantee in an oil lease placed in escrow
wrongfully took possession of it and placed it on record without
the lessor's knowledge or consent, one who in good faith pur-
chased the lease from such grantee is entitled to judgment against
him for the amount paid for the lease.

11. MONEY RECEIVED—NATURE OF OBLIGATION.—An action for money
had and received can be maintained whenever one man has
received or obtained possession of the money of another which
he ought, in equity and good conscience, to pay over.

12. ESCROW—PERFORMANCE OF CONDITION.—When a deed is delivered
merely as an escrow, to take effect upon the performance of
some condition by the grantee in the future, no title passes until
the condition has been performed, even to an innocent purchaser
without notice.

Appeal from Union Chancery Court, First Division;
*J. Y. Stevens,* Chancellor; reversed in part.

*J. W. Warren, J. B. Moore, Gaughan & Sifford, Betts
& Betts, Powell, Smead & Knox,* for appellant.

*Davis & Costen,* for appellees.

*Carmichael & Hendricks,* for appellee Lockhart.

Wood, J.   On March 5, 1923, Roxie Wilson Tatum, Rosie Wilson Winn, Major Wilson, and Lyna Wilson Murdock, instituted their action in the Union Chancery Court against Willie Wilson, A. C. Benson, C. J. Lockhart *et al.,* to cancel and set aside a deed from Lizzie Wilson to Willie Wilson and an oil and gas lease from Willie Wilson to A. C. Benson and by Benson assigned to C. J. Lockhart.   The land described in these instruments is the southeast quarter of the southwest quarter of section 6, township 16 south, range 15 west, Union County, Arkansas.   It was alleged that the plaintiffs were the children and the only heirs of Charlie Wilson, who died in 1911, leaving surviving him the plaintiffs and Lizzie Wilson, his widow, who was a second wife of Charlie Wilson and not the mother of plaintiffs.   It was alleged that Willie Wilson claimed to be the owner of the land in controversy by deed from Lizzie Wilson, who died in 1922; that various and sundry persons were claiming to own the land through the above-named defendants. They prayed that these instruments be canceled as clouds on their title.   This action was numbered 4272 in the chancery court.

On March 12, 1923, Walter G. Wilson instituted a separate action against the above-named plaintiffs and the defendants and others.   He claimed that he was the owner of an undivided half interest in the above tract of land as the son of Robert Wilson, brother of Charlie Wilson, owner of the land, who died without issue in the year 1922; that his mother and father were both dead, and that all other collateral heirs of Charlie Wilson were dead, leaving him the only surviving heir.   He prayed that his title to an undivided half interest be quieted as against all other claimants.   This action was numbered 4284.

F. P. Vines filed an answer in the action numbered 4284 on May 15, 1923, in which he denied that Walter Wilson was a collateral heir of Charlie Wilson and that

he had any interest in the lands, and alleged that he was the owner of an undivided half interest by virtue of quitclaim deeds executed to him by the collateral heirs of Charlie Wilson, and prayed that his title be quieted.

On June 4, 1923, one W. S. Biles, trustee, filed his intervention in the action numbered 4284, in which he admitted that Charlie Wilson was the owner of the land, and alleged that he died without lineal descendants. Biles alleged that he was the owner of all the lands, one-half thereof through deeds from certain parties named by him, who, he alleged, were the collateral heirs of Charlie Wilson, and the other undivided half interest by virtue of a deed from Willie Wilson.

On June 7, 1923, the two causes were consolidated and ordered thereafter to proceed under No. 4284. November 28, 1923, C. H. Murphy filed an answer and cross-bill in which he claimed under a commissioner's deed executed to him in pursuance of a foreclosure of a mortgage on the land. He prayed that the title be quieted in him as against all other claimants.

On December 5, 1923, interventions were filed by Major Jackson and Cheney Lee, claiming to be the owners of an interest as the grandchildren and collateral heirs of Charlie Wilson. On January 9, 1924, Willie Wilson and his wife, Viola Wilson, filed their joint answer to the complaints and interventions, in which they denied all material allegations of the complaints and interventions affecting their interest, and alleged, by way of cross-complaint, title to the land in controversy by deed from Lizzie Wilson to Willie Wilson and by adverse possession as their homestead since May 16, 1922. In their complaint they charged that the purported deed from Willie Wilson to W. S. Biles, trustee, was a forgery, and, in the alternative, if the court did not so decide, that the claim Biles was asserting under it was a fraud on their rights. On March 1, 1924, Vines filed an amended answer and cross-complaint in which he denied the title of all claiming an interest in the land, and, by way of cross-complaint, stated that he was the owner of an

undivided half interest by virtue of conveyances from the only descendants of the collateral heirs of Charlie Wilson, who died without issue.

Benson filed an answer on June 2, 1924, in which he denied the claims of Walter Wilson and the other plaintiffs and the claims of all the interveners. He denied that he obtained the lease under which he claims, and through which he conveyed the title to Lockhart, wrongfully or unlawfully, but states the same was executed and delivered to him in good faith. He denied that he was indebted to Lockhart, and admitted he had not paid the full purchase price of the property conveyed by Willie Wilson to him and by him in turn to Lockhart, but alleged that he was able and willing at all times to pay the same, and offered in his answer to do so. On October 6, 1924, Lockhart filed an answer and cross-complaint in which he alleged that he was the owner of oil and gas rights by mesne conveyances from Charlie Wilson, the owner in fee of the land, and deraigned title from him to Lizzie Wilson, his wife; from her to Willie Wilson; from him to A. C. Benson, who conveyed the lease to him, Lockhart. He denied that the other plaintiffs and interveners had any interest in the land. For cross-complaint against his codefendant, Benson, he alleged that he purchased from A. C. Benson an oil and gas lease on the southeast quarter of southwest quarter of section 6, township 16 south, range 15 west, Union County, Arkansas, and paid therefor the sum of $20,000, and, in the event the title thereto fails, the said Benson will be indebted to the said Lockhart for the sum of $20,000 with interest, etc. He then alleges that Benson is a nonresident of the State, and is the owner of an interest in oil and gas leases of lands situated in Union County, Arkansas, which he describes, and alleges that he has given notice of the filing of *lis pendens* against this property. He prays for an equitable garnishment and that the property described be impounded until the final determination of these actions, and, in the event his title fails and judgment be rendered against him, he prays for judgment

against Benson. By an amendment to his answer to all the plaintiffs and interveners he set up that he paid Benson $20,000 for the assignment of the lease on the land in controversy, and, after acquiring such lease, he began to advertise units in said lease for sale and sold said units to others who had no notice of the claim of the plaintiffs or of the interveners. He stated that, after he had thoroughly advertised and sold a great many of the units, he expended the sum of $13,500 in drilling a well on the land. He alleged that the making of the lease and the assignment were matters of record in Union County, and that all knew that the land was being prospected and drilled. He alleged that Willie Wilson and all the plaintiffs and interveners knew that he was selling units to innocent purchasers, and that drilling was going ahead. Lockhart therefore set up that he and all claiming under him were innocent purchasers, and that Willie Wilson and all the plaintiffs and interveners were estopped, under the circumstances as above set forth, from maintaining their action as against him (Lockhart), and he prayed that all their complaints and interventions as against him be dismissed.

On October 10, 1924, one H. L. Armstrong filed an intervention in which he adopted the answer and cross-complaint of W. S. Biles, and alleged that on August 24, 1924, he acquired the property by warranty deed from Biles for a valuable consideration. He alleged that, if there was any secret agreement by which Biles was to hold the land in trust for Willie Wilson, he knew nothing of it, and demanded strict proof thereof. He specifically pleaded the statute of frauds against such an agreement, and set up that he was an innocent purchaser, and asked that his title be quieted.

The answer of Benson, to which we have already referred, denied that he was indebted to Lockhart in any sum, and prayed that the cross-complaint of Lockhart and all complaints and interventions be dismissed as to him. On December 1, 1924, Willie Wilson and Viola Wilson, his wife, filed their answer to the intervention

of Armstrong, in which they deny all material allegations set forth therein, and renew their prayer that all the complaints and interventions be dismissed for want of equity as against them, and that the conveyance from Biles to Armstrong be canceled as a cloud on their title, and for all proper and general relief.

On December 1, the court heard a demurrer by Willie and Viola Wilson to the intervention of Murphy, and sustained the same and dismissed the intervention. Murphy excepted and prayed an appeal, but has not perfected the same.

It is stipulated by all parties that Charlie Wilson died intestate about the year 1910, and that, at the time of his death, he was the owner of the lands in controversy. It is further stipulated that all instruments of writing of record affecting the lands since 1910 are evidence in the cause.

Taxes for the year 1910 were paid by Charlie Wilson, in 1911 by Young and Anderson, in 1912 by Henry Crayton, from 1913 to 1921 by Lizzie Wilson, and for 1922 and 1923 by Willie Wilson.

The trial court, after hearing all the testimony adduced on the above issues, rendered a decree canceling the lease of Willie Wilson and Viola Wilson to A. C. Benson and its assignment by Benson to Lockhart, and quieting title of Biles, trustee, and his assignee Armstrong to the land in controversy, upon their payment to Willie Wilson of the sum of $3,000. The court entered a decree against Benson in favor of Lockhart in the sum of $2,800, and also a decree dismissing for want of equity the original complaint of Roxie Wilson Tatum and co-plaintiffs, the complaint of Walter G. Wilson, and the complaints and interventions of all parties claiming as lineal descendants and collateral heirs of Charlie Wilson, and of all parties claiming as grantees under them.

Appeals and cross-appeals have been perfected here by parties whose interests were adversely affected by the decree. The multitude of parties and the multiplicity of issues presented by this record make it wholly imprac-

tical to set out in detail and discuss at length the testimony on the issues in which we agree with the findings and decree of the trial court. We have thoroughly examined all the testimony covering these issues, and the parties and their attorneys must be content with a brief statement of our conclusions concerning them.

1. As to Roxie Wilson Tatum *et al.,* the original plaintiffs who claimed to be the children and lineal descendants of Charlie, Wilson, the testimony is not sufficient to prove that Charlie Wilson, their father, and Mollie Owens, their mother, were living and cohabiting together in Arkansas as husband and wife recognizing and holding each other out as such, on February 6, 1867, when the act was passed providing that "all negroes and mulattoes who are now cohabiting as husband and wife and recognizing each other as such shall be deemed lawfully married." There is some testimony to the effect that these four children were the children of Mollie Owens by Charlie Wilson, but the testimony falls far short of proving that they were born while Charlie Wilson and Mollie Owens were living and cohabiting together as husband and wife in Arkansas. Therefore these four plaintiffs do not prove that they are entitled to inherit as the children and heirs of Charles Wilson according to the act approved February 6, 1867, under which they claimed. *Meekins* v. *Meekins,* 169 Ark. 265.

2. As to Walter Wilson and all others who claim as and under collateral heirs of Charlie Wilson, the testimony is so vague, conflicting and uncertain, we are unable, after a careful reading and consideration of it, to say that the finding of the trial court that none of them were entitled to inherit as the collateral heirs of Charles Wilson is clearly against the preponderance of the evidence. The decree dismissing the complaints and interventions of all who claim as and under collateral heirs is correct.

3. This brings us to the issue between Willie Wilson and those claiming by or under him. It is undisputed that Charles Wilson died owning 80 acres of land in Union

County, Arkansas, of which the forty acres in contro-
versy was a part, and that this land constituted his home-
stead; that he died leaving his widow, Lizzie Wilson, in
possession of the land; that the forty on which they
resided at the time of his death was mortgaged, and she
abandoned her claim to this forty and moved on to the
forty now in controversy, and improved the same and
claimed it as her own, whereon she lived until she died.
Willie Wilson, the illegitimate grandson of Charlie Wil-
son, and who had been reared by him and Lizzie Wilson,
continued to live with Lizzie Wilson until her death.
Before her death she conveyed to Willie Wilson by war-
ranty deed the land in controversy. The land was a new
acquisition, and, as we have seen, Charlie Wilson had no
children. Therefore at his death, his wife, Lizzie Wilson,
was entitled to one-half of his real estate in fee simple,
and took one-half the forty acres of land in controversy.
Section 3536, C. & M. Digest. The effect of the decree in
this case is to declare that Lizzie Wilson had title to an
undivided half of the land in controversy, and that she
had conveyed the same by warranty deed to Willie Wil-
son. The chancery court had jurisdiction to so decree,
and its decree in this respect is correct. See *Baxter* v.
*Duvall*, 152 Ark. 175-179, 237 S. W. 701; *Maxwell* v.
*Awtry*, 154 Ark. 85-89, 235 S. W. 384; *Beal-Burrow Dry
Goods Co.* v. *Kessinger*, 132 Ark. 132-135, 200 S. W. 1002.

A. We will now dispose of the issue between Wil-
lie Wilson and W. S. Biles and his grantee, Armstrong.
Biles contends that Willie Wilson and his wife, Viola, on
March 13, 1923, conveyed to him by quitclaim deed the
lands in controversy, and he produced in evidence a deed
purporting to be signed by Willie and Viola Wilson and
duly acknowledged by A. C. Neygaard, notary public, and
witnessed by M. T. Thompson and Robert Wilson, con-
veying to him, as trustee, the lands in controversy, sub-
ject to an oil and gas lease previously given by Willie
Wilson to A. C. Benson. Biles testified in substance that
the land was purchased pursuant to an agreement entered
into between him and three others, including Chavis, that

he and two associates would furnish Chavis and the other associate $2,500 with which Chavis was to procure for all of them deeds to property in the oil district of Union County, Arkansas, from certain parties named Wilson and others. This Chavis did. Title was taken in Biles' name as trustee for the benefit of himself and his associates. He exhibits an agreement signed by himself and associates as testified to by him, dated February 20, 1923.

Chavis testified that he was a lawyer, and lived at Pine Bluff; that he procured a deed from Willie Wilson and his wife, Viola Wilson, to Biles, after fully explaining to them its purpose. The understanding was that the $10 consideration was paid to Wilson, and that the deed was to be given to Biles as trustee. Biles was to perfect the title to the lands for the parties owning the same, and then Wilson and the parties conveying the lands were to sell the same to Biles when the title was cleared up and it was ascertained who the owners were. He paid Wilson, and other parties from whom he had obtained like deeds, checks each in the sum of $10. Other parties who signed like deeds were present, whom witness named. He stated that the deed to Biles was witnessed by Robert Wilson and M. T. Thompson. Thompson testified that he witnessed the deed, and his testimony was to the same effect as that of Chavis. Chavis was asked to produce the checks he had given in the sum of $10 each, and stated that he would, but did not do so. Demand was made also for the original deed, but it was not produced.

On the other hand, Willie Wilson alleged that this deed was a forgery, and he and his wife, Viola Wilson, testified that they did not sign and acknowledge such a deed; that they did not know A. C. Neygaard, the notary public who took the alleged acknowledgment. The other alleged witness to the deed, Robert Wilson, testified that he was not present and did not witness such a deed, and likewise the other parties who Chavis and Thompson stated were present, testified that they were not present and did not witness such a deed. The notary public, A. C. Neygaard, did not testify.

We are convinced that a preponderance of the evidence shows that the purported deed from Willie and Viola Wilson was a forgery. Since the charge is made that the deed is a forgery, the certificate of acknowledgment is not conclusive of the facts recited therein, and hence the makers of the deed were not precluded from showing that the deed was a forgery. *Myers* v. *Jerry,* 158 Ark. 314, 250 S. W. 34.

But, if we are mistaken in concluding that the deed was a forgery, it is certain, under the testimony of Biles' agent, Chavis, who procured the deed, and the testimony of Thompson, the only other witness for Biles who testified to the execution of the deed, that Willie Wilson and his wife Viola Wilson made the deed to Biles, as trustee, for the purpose of perfecting title, and under a promise that, when that was done, they would then convey the absolute title of the land to him. It must be borne in mind that the testimony of Chavis and Thompson was introduced on behalf of Biles. Biles certainly cannot be allowed to repudiate the testimony of his own agent as to the consideration for the deed, and the testimony of his agent, corroborated by the testimony of the only witness he introduced, shows that Willie Wilson and Viola Wilson executed the deed to Biles, not for the sum of $3,000, but for $10, and with the understanding that they would, when Biles cleared the title, convey to him absolute title to the land. It is very clear therefore that Biles himself has proved that the minds of the parties to the contract under which this deed of March 13, 1923, was executed never met, unless the deed was executed for the consideration and purposes as disclosed by the testimony adduced for Willie Wilson as well as that adduced by Biles through his own agent, Chavis. Biles is bound by the representation of his own agent who negotiated for him the purchase from Willie Wilson. The consideration for this deed was open to explanation. See *McGill Lbr. Co.* v. *Lane-White Lbr. Co.,* 90 Ark. 426, 429, 119 S. W. 822, and cases there cited. The only consideration named in the deed is $10, and the only testimony in the record showing

the real consideration for the deed was to the effect that the parties had not determined what Biles should pay for an absolute title. There is not a particle of testimony in the record to prove that Willie Wilson agreed with Biles that he would take $3,000 for the land in case the lease to Benson were canceled. Therefore the decree of the court vesting the fee title in Biles, trustee, and Armstrong upon their payment to Willie Wilson of the sum of $3,000 is wholly without any testimony to sustain it.

In August, 1924, Biles, trustee, executed a warranty deed to H. L. Armstrong, conveying to him all Biles' interests in the land in controversy, subject to the oil and gas leases given by Willie and Viola Wilson to A. C. Benson. The consideration named was $2,500, and it is recited in the instrument that Biles, as trustee and as individual, did, on the 12th of March, 1923, for a valuable consideration, transfer to Armstrong all his rights under a certain contract entered into on the 23rd of February, 1923. The contract here referred to was the contract between Biles and his associates whereby it was agreed to put up $2,500 for the purpose of acquiring title to 80 acres of land, including the lands in controversy, and perfecting the title to the same. At the time the deed or instrument of August, 1924, was executed by Biles to Armstrong, there was on record in Union County a *lis pendens* of the lands in controversy. At the time Biles entered into the agreement on February 20, 1923, with his associates, he had no title to the land in controversy, and the agreement so recites. He never thereafter perfected the title as trustee, according to the understanding between his agent Chavis and Willie Wilson, and never obtained any title to the land such as his own agent testified was contemplated, in consideration of the alleged quitclaim deed of March 1, 1923, executed by Willie and Viola Wilson. Armstrong testified that he paid $2,500 for the land, and that he did not know anything about the alleged trust agreement between Chavis and Willie and Viola Wilson. But he obtained no title under the instrument of February 23, 1923, under which he claims, and

the instrument itself was notice that he might never obtain title, therefore, even if the deed from Willie and Viola Wilson to Biles was not a forgery, the above facts do not constitute Armstrong an innocent purchaser.

B.   This brings us to a consideration of the issue between Willie Wilson and Lockhart.   On May 18, 1922, Willie Wilson executed a gas and oil lease on the land in controversy to one A. C. Benson, leasing to Benson in the usual form 7/8 of the oil and gas of the land in controversy.   This lease was not delivered directly to Benson, but was delivered to one Patrick W. Murphy, to be held in escrow.   Murphy testified concerning this substantially as follows:   He identified the record of the purported lease for the lands in controversy, and stated that Willie Wilson was brought in to his office by Benson and a Mr. Reeves for the purpose of buying the lease and arranging to place the same in escrow during the examination of the abstract of title.   The lease was to be executed by Willie Wilson and left with the witness in escrow, to be delivered to Benson upon his approval of the title and the payment to Wilson of the sum of $3,000.   The escrow agreement and the lease were executed and delivered to witness with the abstract of title.   Witness was informed by Mr. Abbott that Willie Wilson did not have a marketable title, and witness so informed Benson.   Witness then placed the abstract and lease and escrow agreement on file.   Witness was taken ill, and went to New Orleans, where he remained for ten months; on his return, he was informed by Abbott that Benson had come into his office, complained of their delay in not filing suit, and took the entire file from witness' office.   Witness did not deliver the lease and escrow agreement to Benson; had no authority to do so, and did not authorize Benson to record the lease or to dispose of it.   Witness warned Benson not to pay Wilson any large sum of money on the lease, because the title was in such shape that the property would be worthless as an oil-producing property, after a lengthy litigation of several years.   While witness was in New Orleans. Benson telephoned witness from Shreveport

that, if witness had not completed the curative work, he would take the matter out of his hands. Witness replied that an arrangement of that kind would be satisfactory to witness. The testimony of the witness shows that no such an arrangement was made. The witness was asked what was the understanding as to the length of time that Benson would have to satisfy himself about the title, and answered that the owners agreed to bear the expense of the curative work, and there was a subsequent *oral* agreement between the parties as to the *time* limit. The testimony of Willie Wilson was to the same effect, and he stated that Benson paid him $200 and never offered to pay him the balance. He never made demand on witness with reference to getting the title straight. Witness did not authorize Mr. Pat Murphy to deliver the lease to Benson. When they undertook to drill a well on witness' land, witness objected. Witness is a colored man, and Benson is a white man. In the fall of 1922 they were preparing to drill a well on witness' land. Witness came in to consult with Mr. Walter Reeves. He told witness that they had no right to drill on witness' land. Witness did not know anything about the lease being in the possession of Benson. Witness told the driller that he did not want him to drill. Witness did not think they had the lease at that time—thought it was still in the hands of Mr. Murphy. The lease was put in escrow May, 1922, and they commenced cutting derrick timbers in November, 1922. They told witness, at the time the papers were placed in escrow, that they would investigate the title in three weeks and pay the witness. He told witness if he did not pay him he would get the lease back. Witness asked the parties, when they started to cut derrick timber, and also when they started to drill, to quit. Witness did not ask them any more because he saw they were paying no attention to him, and witness thought the next time they might be hitting him. They did not say anying about hitting him, but they were not talking any too good.

Lockhart testified that he bought Benson's interest in the land in controversy, for which he paid $20,000. He

did not know of any outside claims at the time he bought. Benson did not furnish him an abstract of the title until the land was paid for. Witness did not demand an abstract. A man by the name of Williams bought the property in witness' name. Witness was not accustomed to doing business that way—had never done so before nor since. Witness did not get any attorney's opinion as to the title before he purchased. He learned that, after the suit was brought, various attorneys had refused to approve the abstract of title. Williams and witness had adjoining offices, and they were working together to sell the property after witness had bought it. Witness stated that he was doing the paying for the property and the inside work, and Williams was doing the outside work. Witness did not demand an abstract because it would have been the same as interfering with another man's business. Williams was to get one-eighth when he sold the property, and after the property was sold Williams got one-eighth as his compensation.

In *Ford* v. *Moody*, 169 Ark. 649, 276 S. W. 595, we said: "The undisputed testimony shows that, at the time Ford had the instruments recorded, the escrow agreement was still in force and he had complied with its terms; therefore there was no delivery of the instruments to him, and, without a delivery of the instrument, no right or title in the property conveyed therein passed to Ford. His act in having the instruments recorded while the escrow agreement was in force was a plain violation of the terms of that agreement, because, although it gave him no real title to the lands in controversy, it operated to becloud the title of the Moodys." In the above case we quoted from *Bondurant* v. *Ennis*, 152 Ark. 372, 238 S. W. 48, as follows: "When a deed is delivered merely as an escrow, to take effect upon the performance of some condition by the grantee in the future, no title passes until the condition has been performed. The transaction is incomplete. It is not the grantor's deed until the second delivery. Even if the grantee obtains possession of it before the condi-

tion has been performed, yet it is not the grantor's deed, and he may avoid it by pleading *non est factum.*" See also *Chandler v. Chandler,* 21 Ark. 95; *Ober* v. *Pendleton,* 30 Ark. 61, and other authorities cited in brief of counsel for Willie Wilson.[*]

In *Fisher* v. *Beckwith,* 30 Wis. 55, it is held (quoting syllabus): "A deed purloined from the grantor or obtained from him fraudulently or wrongfully, without his consent or acquiescence, does not pass the title even as against a subsequent purchaser for value without notice." See also 16 Cyc., p. 579-81; 10 R. C. L., p 636. Now, Benson has not testified, and no explanation is offered of his conduct in withdrawing the lease from the files of the escrow agent while the latter was sick and absent from his office, and without his knowledge or consent. For the uncontroverted proof is that Benson took the lease and escrow contract without any arrangement whatever with Murphy or Willie Wilson and without paying Willie Wilson the purchase money for the lease, and had the lease placed on record. Without explanation, this conduct of Benson justly opens him to impeachment for the exploitation of Willie Wilson's land, with no shadow of excuse or justification for his unlawful and wrongful conduct. He took $20,000 from Lockhart with nothing whatever in law to give in return. Therefore Lockhart is entitled to a decree against Benson for that amount of money, under the doctrine announced in *Brand* v. *Williams,* 29 Minn. 238, and approved by us in *Arkansas National Bank* v. *Martin,* 110 Ark. 578-585, as follows: "An action for money had and received can be maintained whenever one man has received or obtained possession of the money of another which he ought in equity and good conscience to pay over. This proposition is elementary." But, as to Lockhart and Willie Wilson and third parties, Lockhart cannot avail himself of the doctrine of innocent purchaser predicated on an instrument wrongfully and surreptitiously taken from escrow, as shown by the above authorities. More-

[*] See 3 Washb., Real Property, p. 270; 16 Cyc. p. 579.

over, so far as the rights of Willie Wilson and third parties are concerned, the conduct of Lockhart himself, in the eyes of the law, is far from innocent. He took the assignment of the lease from Benson before the same was recorded, and paid his $20,000, without an abstract of title and without inquiry as to title. He took the assignment of the lease, wholly indifferent to a title which had been condemned by every lawyer and abstracter who had examined the same; and, in conjunction with his outside agent, Williams, they proceeded to unload the lease upon a gullible public. It occurs to us, when the circumstances are considered under which this lease was withdrawn from escrow and the rights of Willie Wilson ignored, and the precipitate haste with which it was exploited to the detriment of Wilson and the public who purchased an interest therein from Lockhart and Williams, that Benson, Lockhart and Williams are all tarred with the same stick. We find nothing in the testimony to warrant us in saying that Willie Wilson is estopped by laches from invoking the aid of a court of chancery to protect his property rights against those who have thus illegally endeavored to destroy them. He did not know that the lease had been withdrawn from the hands of his trusted escrow agent; he had not received pay for his property; he protested as vigorously as he deemed it expedient, considering those with whom he was dealing, at their first incursion upon his homestead. He was required to do no more. The trial court therefore was correct in finding that the lease had not been delivered to Benson and in canceling the same and the assignment thereof to Lockhart.

The decree of the court quieting the title of the lease of the lands in controversy in Biles and Armstrong is reversed. A decree should be entered in favor of Lockhart against Benson in the sum of $20,000, with interest from the time the money was paid to Benson, and a decree should be entered canceling the lease of Willie Wilson to Benson and the assignment thereof to Lockhart, and quieting the title of Willie Wilson to an undivided one-

half (20 acres) of the land in controversy. For the errors indicated the decree is reversed, and the cause is remanded with directions to enter decrees herein indicated, and for such other and further proceedings as may be necessary according to law and not inconsistent with this opinion.

McCULLOCH, C. J. (dissenting). The chancery court did not pass on the question of the validity of the lease from appellant, Willie Wilson, to Benson. The decree was against Wilson, and the court canceled the Benson lease only as against the rights of appellees Biles and Armstrong, and this was done for the reason that the title was in appellees and that the lease was not of any validity as against them. The question of the validity of the lease as against Wilson was not fully developed in the trial below. This is evident from a consideration of the record and the appearance of the only testimony, that of witness Murphy, in regard to the lease having been prematurely taken out of escrow by Benson. Opportunity for the trial of that issue should be given on the remand of the cause, instead of directing a decree in favor of Wilson. In other words, the parties ought to have an opportunity to develop that question and to have it decided upon all the testimony which could be adduced on that subject. But, even if the question of the validity of the lease is to be decided in this court, it seems to me that the court has adopted a very rigid rule in holding that Lockhart, the assignee of the Benson lease, is not entitled to any protection at all. The rule of law on the subject is, as stated in the opinion of the majority, that a deed wrongfully and prematurely taken out of escrow without performance of the specified conditions of the deposit does not pass the title of the grantor, but this rule is subject to limitations which are consonant with conceptions of equity and natural justice. In other words, the rule is to be applied only to the extent of protecting the interest of the grantor and no further as against an innocent purchaser. The ends of justice will be fully attained by compelling the innocent purchaser to pay the purchase

price, which was sought to be avoided by the wrongful taking of the instrument out of escrow. A court of equity should go no further in applying such a rigid rule.

The proof is undisputed that Lockhart, the assignee of the lease, was an innocent purchaser. He testified that he paid Benson $20,000 for the lease, and that he had no information or notice of any kind that the lease had been in escrow or prematurely taken out of escrow. It being proved that Lockhart paid a valuable consideration for the lease, the burden of proof was upon those attacking the validity of the lease to show that Lockhart had notice of any infirmity in the title. There is no proof at all in the record charging Lockhart with notice.

My conclusion is therefore that the case ought to be sent back for a trial on this issue; but, if not, the decree ought to provide that Lockhart must pay the consideration named in the lease to Benson; otherwise that the lease be canceled, and only on such failure to pay.