CLARK *v.* WILSON.

Opinion delivered July 4, 1927.

1. MARRIAGE—SUFFICIENCY OF EVIDENCE.—A preponderance of the evidence is sufficient to prove a legal marriage.

2. DESCENT AND DISTRIBUTION—PROOF OF RELATIONSHIP.—Relationship of a daughter may be established by a preponderance of the evidence.

3. ADVERSE POSSESSION—SUFFICIENCY OF EVIDENCE.—Evidence *held* to show that deceased widow had claimed to own land adversely as grantee of her previously deceased husband, not under her marital rights or rights to the homestead, though no deed from him to her was recorded.

4. ADVERSE POSSESSION—NOTICE.—Notice of adverse possession of land by widow as grantee of her deceased husband would be imputed to a husband's granddaughter, an illegitimate child of his daughter, whose existence was unknown to the grandparents, though she had no actual knowledge of that fact.

5. DESCENT AND DISTRIBUTION—LACHES.—The unknown granddaughter of deceased *held* guilty of laches where 15 years had intervened and oil had been discovered on the land, and expensive litigation with other claimants had been conducted between the death of the grandfather and institution of the suit by the granddaughter to recover land claimed and occupied by her grandfather's widow and her grantee.

6. EQUITY—LACHES.—A court of equity may, in exercise of inherent powers, refuse relief sought after undue and unexplained delay, where injustice would be done by granting the relief asked.

Appeal from Union Chancery Court, First Division; *J. Y. Stevens,* Chancellor; affirmed.

*Coleman & Gantt, J. Bernhardt* and *U. J. Cone,* for appellant.

*Saxon, Wade & Warren,* for appellee.

SMITH, J. A negro named Charlie Wilson, who died in 1910, owned, at the time of his death, two forty-acre

tracts of land in Union County.   The land was described as follows:   The southeast quarter   of   the   southwest quarter of section 6, and the southwest quarter of the southeast quarter of section 6, township 16 south, range 15 west.   The witnesses refer to the first tract as the "west forty" and to the other as the "east forty," and for convenience we will employ the same descriptions.

The west forty was the subject of the litigation in the case of *Wilson* v. *Biles,* reported in 171 Ark. 912, 287 S. W. 373, while the east forty was the subject of the litigation in the recent case of *Clark* v. *Friend, ante* p. 26, in which the opinion was delivered on May 16, 1927. The opinions in those two cases recite many of the facts which appear in the record on the present appeal. ·

On the first appeal, which involved the west forty, numerous litigants claimed title   through   conveyances from various persons claiming to be collateral heirs of Charlie Wilson.   Others claimed under the children of Mollie Owens, who, it was alleged, had been the wife of Charlie Wilson and had borne him four children.   Under the record then before us we found that these collateral heirs had not made their case, and that a lawful marriage had not been proved by the heirs of Mollie Owens, and that the land was a new acquisition by Charlie Wilson, and that, as he left no children or descendants of children, Lizzie Wilson, the widow of Charlie Wilson, was entitled to one-half of his real estate in fee-simple, under § 3536, C. & M. Digest.   We held that the effect of the decree from which the appeal in that case came was to declare that Lizzie Wilson had title to an undivided one-half of the land owned by Charlie Wilson, and that she had conveyed the west forty to Willie Wilson by a warranty deed, and the validity of that deed was upheld as a conveyance by the widow of the estate which she had acquired upon the death of her husband.

Willie Wilson is the legitimate son of Rosa Wilson, a daughter of Charlie Wilson born out of wedlock.   He was born in the home of Charlie and Lizzie Wilson, and

was reared by them as an adopted child, although he was never legally adopted.

During the progress of the taking of the testimony on the former appeals, testimony was offered which led to the belief that Charlie Wilson had a grandchild, who, if living, would inherit to the exclusion of all the collateral heirs. This testimony was to the effect that, immediately after the Civil War, and not later than 1868, Charlie Wilson was lawfully married to Fannie Mayo, by whom he had two children, one of whom died in infancy, and the other child, a girl named Dorcas, grew to womanhood, and, without having married, gave birth to a daughter, and that this daughter, although a bastard, would inherit from her mother, who was the only legitimate child of Charlie Wilson.

The present record is an exceedingly voluminous one, as more than a hundred depositions were taken, and much of the testimony is directed to an attempt to prove a lawful marriage between Charlie Wilson and Fannie Mayo, and that a female child, Dorcas, was born of this union, and that she became the mother of one Fannie Watt, who is said to be the sole heir-at-law of Charlie Wilson.

One of the witnesses giving this testimony was Dora Wafford, half-sister of Dorcas, who testified in one of the former cases that Dorcas was a daughter of Charlie Wilson and Fannie Mayo, and was survived by a daughter named Fannie, whose father was one William Wallace.

Immediately an extended search was begun for this granddaughter, and a woman between thirty and thirty-five years old was finally located in a levee camp near Hughes, Arkansas, who is said to be this missing heir. Her father, however, was William Watt, instead of William Wallace, and upon finding this woman she executed a declaration of trust, wherein she employed O. W. Clark, as trustee, to institute suit to recover both forty-acre tracts for her as the heir-at-law of Charlie Wilson.

The first fact to be established to recover the land was that Charlie Wilson and Fannie Mayo were lawfully married, and it is insisted that they were lawfully mar-

ried in Union Parish, Louisiana, before Charlie Wilson left that State and came to Arkansas. This fact is shrouded in much doubt, as it was said to have occurred nearly sixty years before the testimony was taken to establish it. However, witnesses were produced who claimed to have been present when the ceremony was performed, and other witnesses testified that Charlie Wilson and Fannie Mayo lived together for a short time in Louisiana as husband and wife. In this connection it may be said that the clerk of the court, who was the custodian of the marriage records in that parish, testified that the marriage records were intact, and that there was no record of any license for this couple to marry.

The testimony is to the effect that Charlie Wilson was then known as Roan Wilson, and the witnesses who identified Charlie Wilson as Roan Wilson testified that Roan Wilson changed his name to Charlie Wilson after he left Louisiana for Arkansas.

It is clearly established that Roan Wilson left Louisiana and came to Arkansas, and that, when he left, he deserted Fannie and brought with him another woman named Ellen Westcreath, but this woman soon returned to Louisiana.

After Roan Wilson left Louisiana, Fannie was twice married and bore children by both husbands, one of these children being Dora Wafford, previously referred to. After coming to Arkansas, Charlie Wilson, who is said to be the Roan Wilson who married Fannie Mayo in Louisiana, lived with Mollie Owens, and four children were born to them while they were cohabiting together. These children were held to be illegitimate in the case of *Wilson* v. *Biles, supra.*

The trial court specifically found, at the trial from which this appeal comes, that the testimony did not establish a legal marriage in Louisiana between Roan Wilson and Fannie Mayo. If we concurred in this finding, it would not be necessary to proceed further, as it is essential for Clark, trustee, to prove a valid legal marriage

between Roan Wilson and Fannie Mayo, and that Roan Wilson and Charlie Wilson are one and the same person.

While there is at least a reasonable doubt about the proof of this essential fact, it is a fact which does not have to be proved beyond a reasonable doubt. A preponderance of the evidence suffices. *Sims* v. *Fisher,* 172 Ark. 1038, 292 S. W. 92. We have concluded, although with no assurance of certainty, that the preponderance of the testimony shows a valid legal marriage in Louisiana between Charlie Wilson and Fannie Mayo. *Leach* v. *Smith,* 130 Ark. 465, 197 S. W. 1160.

The next essential fact for Clark, trustee, to establish is that a child was born to this union, that this child was Dorcas Wilson, and that Fannie Watt is the child of Dorcas, it being conceded that this child of Dorcas was illegitimate. The illegitimacy of Fannie Watt is immaterial if she is in fact the child of Dorcas, and if Dorcas is the child of Charlie Wilson and Fannie Mayo, as a bastard can inherit from the mother. Section 3473, C. & M. Digest.

The court found the testimony was not sufficient to establish this second fact, and this finding would also be conclusive of the case if we concurred in it. The relationship of Fannie Watt as the daughter of Dorcas Wilson and that of Dorcas as daughter of Charlie Wilson and Fannie Mayo is a fact which may also be established by a preponderance of the evidence, and, while the testimony is not clear and satisfactory, that degree of proof is not required, and we have concluded that the preponderance of the evidence shows that Fannie Watt is the daughter of Dorcas, and that Dorcas was the legitimate child of Charlie Wilson and his wife Fannie.

We do not set out the testimony, as no useful purpose would be served in doing so, and it may be conceded that there are many contradictions in it, due, no doubt, to the long period of time which the testimony was required to cover and the moving about by the parties whose identity it is sought to establish, but a very careful consideration of it all leads to the conclusions we have announced.

It appears from the opinion in the second appeal, that of *Clark* v. *Friend, ante* p. 26, that Charlie Wilson had become indebted to the firm of Young & Anderson, and had executed a deed of trust to the east forty, if not to both forties, and by a foreclosure, or in some other manner, Young, as the surviving partner, acquired the title to the east forty. Charlie Wilson resided on this forty until the time of his death, and, soon after his death, Lizzie and Willie Wilson moved to the west forty, where Lizzie resided until her death. Lizzie built a home and the usual farm outhouses on the west forty, and cleared, fenced and cultivated about half of it.

Appellants contend that Lizzie took possession of the west forty as the widow of Charlie Wilson, and that, as she had the right so to do, her possession was never adverse to the granddaughter, Fannie Watt. It is certain, however, that, even though Fannie Watt is the daughter of the only legitimate child of Charlie Wilson, neither he nor Lizzie Wilson ever knew of her existence.

One of Charlie Wilson's nearest neighbors was Nazareth Flanagan, who for twenty years lived only a few hundred yards from Charlie Wilson. This person testified that it was always understood by every one in the neighborhood that Charlie had deeded the west forty to his wife Lizzie, and that he saw the deed from Charlie to his wife, although he did not examine it to see if it was signed.

Robert Bradford, another neighbor, testified that it was always understood that one forty "went for the mortgage" and that the other forty was deeded to Lizzie, and that, on one occasion, Lizzie Wilson brought a deed to him, which she said was from Charlie, and asked him to take care of it for her, but he declined to do so, as he had no trunk, and his house had recently burned.

Rhoda Flanagan testified that she lived for years in a house facing the one in which Charlie lived and died, and that she saw and talked with him and his wife Lizzie every day, and that, when Charlie got sick, he sent for

the husband of witness and told him that he had deeded the west forty to Lizzie and had Lizzie to "give her old man the deed to keep for her," and that her husband kept it for a good while, but he gave it back to Lizzie after Charlie died.

Charlie Blackmore, another negro, gave testimony corroborative of the testimony recited, and Willie Wilson testified that, when his grandfather, Charlie Wilson, got so he couldn't work the land, he executed a deed of trust to Young & Anderson, and later gave Lizzie Wilson a deed to the west forty. This deed was never recorded, but all the testimony makes it very certain that Lizzie Wilson claimed to own the west forty, and was regarded by all the neighbors as being the owner thereof, and we think it is clear that she occupied and claimed the land, not under her marital rights, but as the vendee of her husband.

We think it is also clear that both Charlie and Lizzie Wilson regarded Willie Wilson with the greatest affection, and, when Lizzie grew old, she deeded the west forty to him. This deed was executed May 6, 1922.

The undisputed testimony shows that the land had but little value at the time of Charlie Wilson's death, being worth only two or three dollars per acre, and that the west forty was less valuable than the other, as the improvements were on the east forty.

It is true also that Lizzie Wilson might have occupied this west forty as a homestead, but it does not appear that she did so. Her possession was of such a character that there would be no question about it being adverse to all the world, but for the fact that she could have occupied it as a homestead had she had no other right to its possession.

In the case of *Brinkley* v. *Taylor,* 111 Ark. 305, 163 S. W. 521, Brinkley owned an eighty-acre tract of land, on which he and his wife resided for thirty-five years, and, after Brinkley's death, his wife claimed title to the land, not under her dower rights, but as owner. A portion of the land was divided into town lots and were sold as such

by Brinkley's widow. The widow took no steps to have her dower assigned, but it is recited in the opinion that, "upon the contrary, she took possession of the entire tract under a claim of ownership, and sold a considerable portion of it." We said that, notwithstanding Mrs. Brinkley entered upon the land without attempting to assert any dower right, her entry and the possession thereunder would not be held to be adverse if the proof did not affirmatively show it to be such. We also said that the widow's possession would be presumed to be permissive, and not in hostility to the heir, unless that fact affirmatively appeared, but, as we found that the possession was adverse and hostile, we held that the widow had acquired the title.

In the case of *Watson* v. *Hardin,* 97 Ark. 33, 33 S. W. 1002, it was said that the possession of a widow is not hostile to the title of the heir, where the widow is entitled to the possession of land as her homestead, that she holds a life estate and the heir a reversion, and the possession of the widow is therefore not adverse to him, and that the general rule is that the statute of limitations does not run against a reversioner until the death of the life tenant.

In that case it was recited that, while in its inception the possession of the widow was not hostile to the heir, it was said that "it is true that her claim and possession might have been of such a nature as to amount to an entire disseizin of the heir and an entire denial of his rights, so as to result in an acquisition of title by adverse possession; but, before her possession could become adverse, it was necessary for her to first repudiate the title (of her husband) and to disavow any claim thereto as his widow; and it was also essential that notice of such disavowal by her of title as widow should be brought home to the heir." But it was there also said that the widow might acquire title by adverse possession against the heir if her disclaimer and hostile possession was so open and notorious as to raise a presumption of notice to him.

In the case of *Wilson* v. *Storthz,* 117 Ark. 418, 175 S.
W. 45, the facts were that Storthz had acquired a deed
from certain heirs, which made him a tenant in common
with other heirs who did not convey and of whose exist-
ence he was in ignorance. In the suit by the cotenants to
recover their interests in the land it was insisted that they
were unaware of Storthz's possession and that he gave
them no notice thereof, but we said that Storthz was una-
ware of their existence, and could not therefore have
given actual notice of his adverse holding, and that, when
all the circumstances of that case were taken into account,
there was such evidence of adverse holding as to meet the
requirement of the case there reviewed, which discussed
the conditions under which one, by adverse possession,
might acquire title against his cotenants.

There was a similar holding in the case of *Miller* v.
*Chicago Mill & Lbr. Co.,* 140 Ark. 639, 215 S. W. 900,
where the existence of a cotenant was unknown to the
occupants, and we held that the occupants had acquired
title by adverse possession against the unknown coten-
ant because their possession had been so adverse and
hostile and long continued as to impute notice of the
adverse holding.

Charlie Wilson died in 1910, and his deed to Lizzie
Wilson, if one was made, was executed some time prior
to that year, the exact date not being shown by the testi-
mony, and her possession was at all times open, continu-
ous, notorious, and adverse, until a few weeks before her
death, when, on May 6, 1922, she deeded the land to Willie
Wilson, who continued this possession.

It is true the suit was begun by the collateral heirs
of Charlie Wilson on March 5, 1923, and Willie Wilson
therefore had had possession under his deed for less than
a year, but the combined possession of Lizzie Wilson and
Willie Wilson covered a period of about thirteen years
between the date of Charlie Wilson's death and the insti-
tution of the suit by the collateral heirs, and the claimants
through Fannie Watt did not become parties until June
13, 1925. There was therefore a period of about fifteen

years intervening between the death of Charlie Wilson and the assertion of title by his granddaughter, Fannie Watt, who, during all that time, was *sui juris*. No actual notice could have been given to her of the adverse holding, because her existence was unknown, but there was such adverse possession that notice thereof must be imputed to her.

It may be said, in this connection, that Fannie Watt did not testify in the case, and there is no affirmative showing that she did not have actual notice of this adverse possession. The only part taken by her in the litigation was to file a pleading designated as a "suggestion to the court," in which she called attention to the fact that she had brought a suit in the Federal district court to cancel her deed to Clark, trustee, on the ground of fraud, and suggested that the present case should await the determination of that case. Refusing to plead otherwise, the court ignored her "suggestion" and proceeded to a final determination of the case.

Of course, if Charlie Wilson executed a deed to Lizzie Wilson, this would be conclusive of the case, but, whether the execution of this deed has been shown with that degree of certainty required to prove the execution of a lost instrument or not, the undisputed testimony shows that Lizzie Wilson claimed that there was a deed, and held possession under this claim, and her adverse holding was known to every one familiar with the land or apparently interested in it.

The defense of laches is also interposed. Lizzie Wilson abandoned the home in which Charlie Wilson had lived and died. She moved on to the other forty, which was then worth only a few dollars per acre. She built her a residence there, cleared the land and fenced it, and for many years paid the taxes, and no one questioned the title until oil had been discovered and the land had become enormously valuable. Twenty-two alleged transfers of the land were placed on record before any action was taken by Fannie Watt or her trustee. Very expensive litigation was prosecuted by more than forty separ-

ate claimants, which Willie Wilson was required to
defend. Clark, as trustee, became a party with full
knowledge of the history of the litigation and the history
of the title, and with knowledge that Willie Wilson was
in the actual possession under a deed of record from
Lizzie Wilson.

Lizzie Wilson was an ignorant colored woman, and
may not have known that it was necessary to record her
deed, or she may have thought the land of so little
value that no one would seek to disturb her, or that there
was no heir of Charlie Wilson who could do so. However
this may be, no attempt was made to assert title through
Fannie Watt until Lizzie Wilson was dead and the testi-
mony was thus lost which might have established the
execution of the unrecorded deed from Charlie Wilson
about which numerous witnesses testified, and, as was
said in the opinion in the case of *Clark* v. *Friend,*
"large sums of money had been expended in
developing oil before any one attempted to assert any
rights through or under Fannie Watt. True, she knew
nothing of the discovery of oil, but that fact proves only
her indifference to her grandfather and to her inheri-
tance. She, no doubt, would have continued inert and
indifferent but for the discovery of oil, which resulted
from the expenditure of the large sum of money always
involved in such explorations and the diligence of appel-
lant."

We there quoted as follows from the case of *Avera*
v. *Banks,* 168 Ark. 718, 271 S. W. 970: "There is no
hard-and-fast rule as to what constitutes laches. It
is well settled that a court of equity may, in the
exercise of its own inherent powers, refuse relief
where it is sought after undue and unexplained delay, and
where injustice would be done in the particular case by
granting the relief asked. It is usually said that the two
most important circumstances in such cases are the length
of the delay and the nature of the acts done during the
interval, which might affect either party and cause a
balance of justice or injustice in taking the one course or

the other in so far as it relates to the remedy" (citing cases).

We think that doctrine is as applicable here as it was there, and that there is as much reason for holding the trustee barred by laches in the suit to recover the west forty as there was to so hold in the suit to recover the east forty.

We think the equity of the case is with appellee, and the decree of the court below is therefore affirmed.