MILLS *v.* PENNINGTON.

4-8293                                    209 S. W. 2d 281

Opinion delivered March 15, 1948.

*J. R. Wilson* and *E. B. Kimpel, Jr.,* for appellant.

*L. Weems Trussell,* for appellee.

GRIFFIN SMITH, Chief Justice.   Ownership of 240 acres is involved.   George J. Williams, by separate purchases, acquired the lands in 1902.   In the controversy with which we are dealing the decision affects 160 acres constituting a homestead, and 80 adjoining acres charged with dower, each parcel being a unit of the original acquisition.[1]

George J. Williams married Abagail Anderson in 1868.   She died without issue living or dead.   Ellana Jane Anderson was Abagail's first cousin, and married Williams in 1882.   To this union six children were born, five of whom died before maturity.   Joseph Albert Williams was born in 1890 and died while in the military service in 1918, unmarried and without issue.

---

[1] The litigation resulting in this appeal was started in September 1944 when Hon. Paul Johnson, Prosecuting Attorney, acting for the State, alleged, *prima facie,* facts in support of his assertion that the Williams lands had escheated.   By various pleadings, including interventions, rights contended for by appellants and appellees were asserted.

In 1894 George J. Williams married Myra Mills. At that time Mrs. Mills had two sons by a former husband. These boys were named Walsh and John. It will therefore be seen that when George Williams married Myra Mills, the united family consisted of husband and wife, and the three boys: Joseph Albert, then four years of age, and his two stepbrothers whose ages are not emphasized.

Two years after George and Myra married a daughter was born—Amelia Victoria. A son was subsequently born, but died in infancy.

When Myra's sons by the former marriage became of age they left the Williams home. Albert and Amelia, brother and sister by the half blood, were living when their father died in 1913.

W. M. Mills, a grandson of Myra Williams, became a member of the Williams household and resided with the family when his grandmother's husband, George Williams, died. He was in the home when Joseph Albert Williams entered the armed forces of World War No. 1. Amelia became an invalid. When Albert went to war, W. M.—who will hereafter be referred to as Mills—continued his relationships, according to appellants' contentions, caring for Amelia and his grandmother. Amelia died in 1924, intestate and without issue. Myra Williams died in March 1941.

During a period of more than twenty years Mills is alleged to have devoted himself to the farm and to personal wants of his grandmother. He built fences, outhouses, repaired main buildings, and in other respects contributed to the orderly and progressive work of farming. In 1925 Mills married Loretta Jenkins, who was invited by Myra to join the household. There is testimony that she said to her grandson, "Bring Loretta here; I am getting too old to do the work". It is contended that at that time, or soon after, Myra told Mills and his young wife that if they would assume responsibility for property upkeep and farm the lands she would "give them everything she had". Under this arrangement, and with other assurances from Myra, they oc-

cupied the property not only during the sixteen remaining years of Myra's life, but were in possession when suit was brought, although not personal occupants.[2] Additional testimony on the question of an intended gift related to Mills' actions "during the early 30's" in executing contracts with the U. S. government in respect of federal bounties, his grandmother having said, "Take the property and use it as you would use your own".

Based upon the facts that have been recited, and other conduct of a similar nature, Mills and his wife contended, (a) that the property had been given to them by Myra; or, (b) if this was not effective, they initially believed Mrs. Williams owned the property, hence their claim was adverse and had ripened into title.

A collateral issue mentioned by appellants, but of no controlling importance here, is that when Joseph Albert Williams died it was ascertained that his half sister, Amelia, was the beneficiary of a $10,000 war risk insurance policy, payable in monthly installments. Following Amelia's death Myra Williams claimed the remainder of $8,069.66 and a probate judgment awarded it to her "as the lawful and only heir and distributee of the said estate". Appellants stress the point that when Myra Williams died, leaving substantial portions of the insurance money, William and Loretta Mills were questioned by attorneys representing the heirs of Walsh Mills. To such questions they replied that an interest in the personal property was not advanced because they were satisfied with assurances of Mills' grandmother—that is, Myra's agreement to give them the land.

There is testimony that Walsh Mills predeceased Myra Williams, but that his heirs disputed Mills' claim to the lands. Appellants think it is significant that the lands were taxed in the name of George J. Williams until 1925, then assessed as the property of Mrs. [Myra] E. Williams, and taxes were paid by Mills, except for the years 1944-45. Mills says he knew in 1945 that the state

*[2] Mills testified that although necessity compelled him to accept temporary employment elsewhere, he left his household effects, farming implements, and other property on the premises, and did not leave with the intention of abandonment.

was claiming by escheat, and thought the suit would determine the various rights.

The trial court found (a) that when George Williams died his property went to the two children, Albert and Amelia, subject to Myra's dower and homestead rights; (b) with Albert's death his interest went to Amelia, subject to the mother's statutory rights, but (c) when Amelia died the line of descent was at an end, hence rights would ascend to the collateral heirs of George Williams, subject to Myra's homestead interest in 160 acres and dower rights in 80 acres.

On this phase of the litigation the Court said the issues were: (1) Did title, after terminating by descent to Amelia and ascending to the heirs generally, remain in them; or, (2) did Myra E. Williams take by adverse possession? (3) If it should be held that Myra took under the adverse claim, did she legally pass title to Mills and his wife?

A summary of facts bearing upon these contentions, as stated by the Court, is printed in the margin.[3]

Substance of these findings is that acts of the life tenant upon which adverse possession is predicated are (a) actual possession of the property; (b) payment of taxes under assessments changed in 1925 from Myra Williams' husband to herself; (c) execution of oil and gas leases pertaining to the property; (d) execution of mineral deeds; and, (e) sale of standing timber.

The law is well settled that a life tenant is entitled to possession of premises to which the estate pertains, and it is the tenant's duty to pay taxes. Appellees concede this to be true, but think that when oil leases and

---

[3] "It is alleged by all of the Mills heirs . . . that the Williams heirs knew of [the existence] of the land, and knew that [George J. Williams died in 1913, and that they have] stood by for thirty-three years and [did not] assert or claim any interest, . . . hence they have abandoned any [interest] they may have once had. From 1913 to March 16, 1941—date of the death of Mrs. Myra E. Williams—they failed to ask that the dower and homestead be set aside; [nor did they] exercise any claim whatsoever. Since March 16, 1941—a period of almost five and a half years (although they had been notified of this litigation by every known means)—they have completely failed to appear and claim any interest . . . and since the death of Amelia Williams . . . Myra E. Williams punctually paid the taxes on the

mineral deeds were executed and delivered, and when substantial sales of timber were made, the dower and homestead interest were repudiated and a claim of ownership hostile to all was asserted.

*Ogden* v. *Ogden,* 60 Ark. 70, 28 S. W. 796, 46 Am. St. Rep. 151, mentions the rule that the statute of limitation does not begin to run against a remainderman until death of the life tenant. See *Killeam* v. *Carter,* 65 Ark. 68, 44 S. W. 1032; *Collins* v. *Paepcke-Leicht Lumber Co.,* 74 Ark. 81, 84 S. W. 1044; *Stricklin* v. *Moore,* 98 Ark. 30, 135 S. W. 360; *Davis* v. *Neal,* 100 Ark. 399, 140 S. W. 278, L. R. A. 1916A, 999; *Lesieur* v. *Spikes,* 117 Ark. 366, 175 S. W. 413; *Hayden* v. *Hill,* 128 Ark. 342, 194 S. W. 19; *Smith* v. *Maberry,* 148 Ark. 216, 229 S. W. 718; *Sadler* v. *Campbell,* 150 Ark. 594, 236 S. W. 588. The last cited case contains this expression: ''It is well established by the decisions of this court that 'neither the possession of the lift tenant nor his grantee by any possibility can become adverse to the reversioner or the remainderman for the reason

land in her name for the years 1923 [and through 1926 and 1940], a period of sixteen years. All of the Mills heirs alleged in their pleadings that she acquired title by adverse possession. Therefore they evidently believed she was the owner at the time this suit was begun. On July 10, 1926, she executed an oil and gas lease on the land, and on the same date executed a mineral deed to the land. On March 6, 1931, she executed a timber deed to the land. All of these instruments appear of record, and no one objected for a period of over twenty years. By reason of said acts [Mrs. Williams] completely repudiated any right of homestead or dower, and thereby set up what she thought was her own title, and for twenty years openly, notoriously, and adversely held, claimed, and asserted right and title thereto. Since her death in March 1941 not a Williams heir has appeared and asserted any claim whatsoever or paid any taxes on said lands. From [these] facts the Court is driven to the conclusion that all of the George J. Williams heirs, and those of Myra E. Williams, including Mrs. Myra E. Williams herself, actually believed that the lands ascended to Mrs. Myra E. Williams upon the death of Amelia Williams. Mrs. Myra E. Williams took possession, claiming ownership, and exercised complete control, openly and adversely, from 1924 to . . . 1941. That status thereby vested complete title in her long before her death''. The trial Court cited and relied upon the following cases: *Roberts* v. *Burgett,* 209 Ark. 536, 191 S. W. 2d 579; *Clark* v. *Wilson,* 174 Ark. 669, 297 S. W. 1005; *Cullins* v. *Webb,* 207 Ark. 407, 180 S. W. 2d 835; *Brinkley* v. *Taylor,* 111 Ark. 305, 163 S. W. 521; *Fletcher* v. *Josephs,* 105 Ark. 646, 152 S. W. 293; *Hayden* v. *Hill,* 128 Ark. 342, 194 S. W. 19; *Stricker* v. *Britt,* 203 Ark. 197, 157 S. W. 2d 18; *Jones* v. *Morgan,* 196 Ark. 1153, 121 S. W. 2d 96.

that such possession is not an interference with the latter' ''.

The trial court was in error in holding that execution of the leases and deed and cutting timber were sufficient to start the statute of limitation in favor of the life tenant. Reliance was upon holdings in *Cullins* v. *Webb,* 207 Ark. 407, 180 S. W. 2d 835, and *Brinkley* v. *Taylor,* 111 Ark. 305, 163 S. W. 521. The Cullins-Webb Case dealt with the grantor's estate, as distinguished from a lease of severable interests or sale of timber. At page 412 of the Arkansas Report it is said: ''. . . Possession was held by the widow; and under the authority of *Brinkley* v. *Taylor, Boyd* v. *Epperson,* 149 Ark. 527, 232 S. W. 936, and *Clark* v. *Wilson,* 174 Ark. 669, 297 S. W. 1008, the heirs had a right to assume that the widow's possession was under her marital right of unassigned dower until notice of her adverse holding was notorious.''

In the Brinkley-Taylor case ''[the widow], from time to time, executed various deeds, purporting to convey the fee to various lots, carved out of the land in question, and the title of all these purchasers, so far as the record shows, has been cured by possession. . . .''

While it may be true that conduct, such as that engaged in by Mrs. Williams in the case at bar, would constitute waste, that alone would not, *ipso facto,* work a forfeiture of the life tenant's rights, although it might be grounds for recompense. *Rutherford* v. *Wilson,* 95 Ark. 246, 129 S. W. 534, 37 L. R. A., N. S. 763.

We agree with the trial Court that acts of the life tenant in dealing with Mills and his wife did not establish an agreement by Mrs. Williams to give the land in exchange for its cultivation, maintenance, and for the support of herself and Amelia. On the issue of descent and distribution, however, (the title being ancestral and coming through the father) it follows that when Amelia died title ascended to George J. Williams' heirs, subject to the dower and homestead rights of Myra. Since these ended with her death in 1941, the life estate passes from consideration. The judgment is reversed, with directions

to enter orders not inconsistent with this opinion. This can be done by the Court, since matters of law only are involved.