## YOUNG *v.* CRAWFORD.

Opinion delivered February 18, 1907.

1. SPECIFIC PERFORMANCE—PAROL GIFT.—A suit against an administrator to enforce specific performance of a parol gift of lands, alleged to have been made by the decedent in his life time, will be treated as if decedent were living, and the appellees were seeking to compel him to make them deeds. (Page 43.)

2. SAME—SUFFICIENCY OF EVIDENCE.—Equity will not decree specific performance of a parol contract for the conveyance of land unless the terms of the contract are clearly and conclusively proved. (Page 43.)

3. SAME—PAROL GIFT.—A parol gift of land will not be enforced unless followed by possession and by valuable and substantial improvements made by the donee, or unless there are some other special facts

which would render the failure to complete the donation peculiarly inequitable.   (Page 45.)

4.   SAME—PART PERFORMANCE.—To raise an equity in favor of the donee to have a parol gift of land enforced on the ground that he has made improvements thereon, it must appear that the improvements are valuable and substantial, and were made in consequence of and reliance upon such gift.   (Page 46.)

5.   SAME—VALUE OF IMPROVEMENTS.—While the fact that the rents or the proceeds from the use of the premises alleged to have been given to defendants greatly exceeded the cost or value of the improvements which defendants, relying upon such gift, placed thereon should not be made a distinct ground for refusal to execute a parol gift, such fact should be considered in determining the nature and extent of the alleged improvement, and in testing the alleged grounds for equitable interposition.   (Page 46.)

Appeal from Washington Chancery Court; *T. H. Humphries,* Chancellor; reversed.

STATEMENT BY THE COURT.

This suit was begun in the Washington Chancery Court against appellees to have dower assigned in the lands in controversy to Anna G. Young, widow of Robert A. Young, deceased, and to have the title to said lands declared to be in Robert A. Young at the time of his death, and to be declared assets of the estate of Robert A. Young for the payment of his debts, subject to the dower rights of the widow.

The land consists of a sixty-acre tract, occupied by appellee Julia Crawford, and designated in the evidence as the Thomasson place, and another tract of eighty acres occupied by appellee Lucinda Ellis, and called the McClain place.

The complaint alleged the marriage of Robert A. Young with Anna G. Young in August, 1880; that Young died February 7, 1902, without issue, leaving his widow, Anna G., and collateral heirs, among whom were Lucinda Ellis and Julia Crawford, who were nieces of Robert A. Young; that Young at the time of his death resided in Nashville, Tenn., where letters of administration were issued, and that claims had been probated against his estate amounting to about $15,000, which were unpaid, and that the assets in the State of Tennessee had been exhausted in the payment of the debts of the estate.   It is alleged that Young

purchased from J. B. Thomasson the place in controversy designated as the "Thomasson" place in January, 1875, and the "McClain" place from W. M. McClain on the 27th day of February, 1878, taking warranty deeds which are exhibited with the complaint. The complaint further alleges that said Robert A. Young after said purchases continued to own and claim title to said lands up to the time of his death; that at the time of acquiring title to the "Thomasson" place said Young placed one Wilson Medearis, who was his brother-in-law, in possession of the same, and that said Medearis held the same as tenant of said Young; that said Wilson Medearis died in the year 1892, and thereafter the defendant Julia Crawford, who was a daughter of said Wilson, continued to occupy the place in like manner as tenant of the said Robert Young until the latter's death in 1902.

It is also alleged that the defendant Lucinda Ellis and her family went into the possession of the 80-acre tract, or "McClain place," at the time of its purchase by Robert Young, and held the same as his tenant and upon the same terms as the "Thomasson place" was held by Wilson Medearis and Julia Crawford, and that the occupants of both farms were to pay the taxes and keep the premises in repair, and to receive the rents and profits.

The complaint alleged the appointment of appellee, Phillips, as administrator by the probate court of Washington County, that claims to the amount of $9,000 had been probated against the estate in that court, and that there were no assets aside from the lands in controversy with which to pay same. The complaint alleged the dower interest in the widow of one-half, as against the heirs, and one-third against the creditors; that Julia Crawford and Lucinda Ellis are in possession of the tracts claimed by each, and refuse to assign dower, and deny the right of the administrator to subject the lands to the payment of the debts of Robert A. Young.

It is alleged that the deed from McClain to Robert A. Young failed properly to describe a portion of the 80 acres "McClain place;" that the defendant Lucinda Ellis thereafter procured a deed to be made to her to that part of said 80 not described in Thomasson's deed to Robert Young by one James F. Bates, who was supposed to have the legal title thereto, but said Lucinda was at the time of taking such conveyance the

tenant of said Robert Young, and paid nothing of value for the deed, and took it without the knowledge or direction of said Robert.

The prayer was for dower, and that Julia Crawford and Lucinda Ellis be declared tenants of Robert Young, at the time of his death, and that the lands subject to dower be decreed to be assets of the estate of Robert Young, for the payment of his debts, and for general relief.

The appellees answered separately, making their answers cross-complaints. They admit all the allegations of the complaint except as to the title to the lands, and allege that the lands were purchased by their uncle for them, that he agreed to hold the lands in trust for them, that they went into possession and made valuable improvements upon the tracts which their uncle had agreed to give them, respectively, upon the promise that he held the lands in trust for them, and that they should be the owners thereof, that their uncle knew of the improvements that were made, and that they were made upon the good faith of the agreement that the lands should be their property. That they paid the taxes, and have held the lands continuously under the agreement. The prayer to each answer was that the lands be decreed to the respective claimants.

The appellants denied the allegations of the cross-complaints, and set up the statute of frauds.

The facts are substantially as follows: Dr. Robert A. Young, a well-to-do Methodist minister of Nashville, Tennessee, was the uncle of appellees, their mother being his sister. She married Wilson Medearis. Appellees and Mrs. Mary Davis and R. A. Medearis were children of the marriage. Wilson Medearis lived in Washington County, this State. He was "talking of moving to Oregon." His son, Robert A., did not want him to move. The father expressed a willingness to remain if he could get the Thomasson farm, and Robert A. wrote his uncle, Dr. Young, to that effect. Dr. Young instructed Robert A. Medearis to buy the farm "for a home for his father," to put him in possession, and let him have the place as a home as long as he lived. He was "to have the proceeds of the farm," and was "to pay the taxes and keep up repairs." Robert A. Medearis, it appears, was the agent for Dr. Young in making the purchase of

the places in controversy.  He testifies that he did not ask his
uncle to give the farm absolutely to his father, but to give it to
him as a home to occupy and have the use of.  He says that,
after his uncle had sent him $400 to pay on the farm, he, Dr.
Young, gave him, Robert Medearis, his choice to take the farm
and give Dr. Young his note for the $400 at six per cent. inter-
est, and in that case to take the deed in his (Medearis's) name,
or to let Dr. Young pay the balance of the purchase price, and
in that case take the warranty deed to himself.  The latter course
was pursued, the deed was made to Dr. Young, was recorded,
and sent to him.  The purchase of the Thomasson farm was con-
summated in 1874.  Dr. Young paid $1,100 for this place.  Con-
cerning the purchase of the McClain place, Robert Medearis
testified in part as follows:

"I purchased the lands for Dr. Young from McClain and
took deed from McClain to Young.  It was my understanding
that this land was bought for the use and benefit of Lucinda Ellis,
and I as agent of Young put her in possession.  The first draft
I received from Young to pay on this land was for $275, and
he instructed me that in case I failed to make the trade to turn
this draft over to Lucinda Ellis.  I do not know where the letter
with this instruction is now.  My recollection is that when I
bought the McClain place my instructions from Young were that
they were to take charge of the place, pay the taxes and keep
the place in good repair.  It was generally understood by the
family connection at the time of the purchase that Lucinda Ellis
was to have the use of the farm; and my instructions from him
were to see that the taxes were paid and the receipts were for-
warded to him."

He said that the "McClain" farm was bought in the same
way and upon the same conditions that the Thomasson farm was
bought.  He had the deed made to Dr. Young, had it recorded
and sent to him.  This witness testified that his father, and his
sister, Julia Crawford, understood that they were to keep the
taxes paid, keep the place in repair, and that they were to have
the proceeds of the farm, and that his sister, Mrs. Ellis, under-
stood "before she went on the place that they were to go on the
farm, have all the proceeds and were to pay the taxes and keep

up the repairs." The McClain farm was purchased in 1877. The consideration for this was $850.

Medearis further testified that after his father's death in 1892 he heard Dr. Young tell Mrs. Crawford and Mrs. Mary Davis that he intended to will the farm to them, and he said at the same time that he intended to will the McClain place to Lucinda Ellis. Medearis said that about February, 1901, his uncle sent him two deeds in a letter, which letter is as follows:

"Nashville, Tenn., February 22, 1901.

"Hon R. A. Medearis,

"Dear Nephew:

"Quietly hold these deeds until I instruct you what to do with them.

"Cordially,
"R. A. YOUNG."

"Shortly after," says he, "Mrs. Ellis received a letter from my uncle that these deeds were in safe hands in Cincinnati Valley. I told them that I had the deeds."

After receiving from his uncle the two deeds he never received instructions to turn them over to any one. He still had in his possession the original deeds to the farms. Medearis understood from his uncle that he intended to make the two investments equal. Concerning the improvements and rent he said:

"Mrs. Crawford built a small box house, 14 by 28 feet, and dug a well on the place. She built a small barn and granary for wheat. There have been about 8 acres cleared since my father died. The house was ceiled and finished, but I think my father did most of that. I think the cost was near $200.

"Mrs. Ellis tore down the old log building, and put in a box house in place of it, and added an 'L.' She put in a wire fence to enclose the place, but I understood most of it is on the Territory side of the line. They also cleared and put in cultivation 12 acres of land, and built a log barn. I estimate the value of improvements made by Mrs. Ellis at $200 to $225. I suppose Mrs. Crawford's place would have rented for $100 per year since my father's death."

Exhibits of letters from Dr. Young to Robert A. Medearis were in evidence, designated A, B, C, and D. These were in cor-

roboration of the testimony of Medearis as to the purpose of
Dr. Young in purchasing the Thomasson place, showing that the
deed was to be made and sent to Dr. Young, and that the place
was "for the use of the family" of Wilson Medearis, that he was
to keep the place "in good repair, pay the taxes regularly and
send the receipts" to Dr. Young. In exhibit D, Dr. Young wrote
that he had settled with his creditors and had not mortgaged any-
thing in Tennessee or Arkansas.

The testimony of appellee Julia Crawford tended to show
that she was placed in possession of the farm by Dr. Young;
that he told her in writing that he had always intended to give
her the place; that after her father's death she might consider
it her own; that in 1895 and 1896, after the death of her father
in 1892, he told her the place was hers, and that he had made
her a deed to it which he had at home in a tin box; that he
would make her a title to it, but she was a widow, and he was
afraid she would marry some man who would get away with it;
and that, relying on these statements and promises, she made im-
provements by clearing land, making fences, digging a well,
building a house, barn and granary, and finishing the house al-
ready there; and that she would not have made these improve-
ments if she had not thought that Dr. Young had made her a
gift of the farm. That these improvements cost $264.75 at the
highest estimate.

The testimony of appellee, Mrs. Ellis, tended to show that
Dr. Young had promised years ago to give her a farm when she
married, and when he was informed of her marriage he wrote
her that he would buy her a little home all her own as soon as
he could; that when he sent Robert Medearis to buy the "Mc-
Clain" place, he directed Medearis to pay the money to her if
he did not get the place, as the money was hers; that when the
place was finally purchased by Dr. Young she went into posses-
sion under the belief that the promise of her uncle to give her the
place had been fulfilled, and that the place belonged to her; that,
so believing, she expended more than five hundred dollars in
clearing and fencing land, setting out fruit trees, adding to the
dwelling and building a smoke-house and barn, costing her more
than five hundred dollars; that she would not have made these
improvements if she had not considered the land her own.

To Mrs. Ellis's deposition were attached as exhibits the letters she had received from her uncle. In one of these, as early as September 4, 1866, speaking of buying land, he says: "I have no children, but you all are next to my own children." In another, of October 14, 1876, he says: "I had rather receive letters from you and Julia (Mrs. Crawford) than from any human beings on earth. I hope the day may come when I will feel able to give you a nice little home all your own." In another he says: "I hope to be able to invest this year or next one thousand or eleven hundred dollars in a home for you." This is dated July 26, 1877. In another of May 12, 1885, he says: "Glad that your husband is at work making improvements on your farm, for it is your farm." In another letter (without date) he says: "Your deeds are in no danger—yours and Julia's. They are in good hands in Cincinnati Valley. At a proper time new deeds will be made out."

After the purchase of the farms, as shown by the testimony of Mrs. Ellis, Dr. Young called her attention to the fact that her place cost $250 less than the Thomasson place, that he said he wanted to make her equal with her sister, and sent her drafts for that amount.

In behalf of appellees a certified copy of a schedule of all the property of Dr. Young, verified by his affidavit, and filed in a bankruptcy proceeding in the United States District Court for Middle District of Tennessee, was introduced in evidence. This schedule contains six lots or parcels of land as "all of his real estate." But the farms in controversy are not included, and there is a statement in the schedule that he had "no property in reservation."

Appellants introduced in evidence a deed from Jno. D. Thomasson to Robert A. Young and a deed from Wm. McClain to Robert A. Young.

Anna G. Young testified that she intermarried with Robert A. Young in Nashville, Tennessee, in August, 1880. They resided in Nashville at the time of Dr. Young's death, which occurred there February 7, 1902. Dr Young had no children. She took out letters of administration on the estate. The estate was insolvent. The administration is still pending. One of the creditors of Dr. Young was Mrs. Kirkpatrick, a daughter of

Anna G. Young by a former husband. She had loaned Dr. Young $2,500, and had taken his note. This was one of the claims probated against the estate. Mrs. Young testified that it was the custom of Dr. Young on the first of each year to make a list of the assets owned by him, that she took these down at Dr. Young's dictation. She exhibits two of these with her deposition, they show that two farms in Arkansas are listed as worth $6,000. She says that she had often heard Dr. Young say that he would permit his nieces in Arkansas to live on the farms until his death, when the farms would become part of his estate.

The court found that said Julia Crawford on the 10th day of January, 1892, took possession of the farm under a gift from said Robert A. Young, and has since held the same under such gift, and has made valuable improvements thereon, relying on said gift; and finds that she is entitled to have her title thereto quieted against the administrator and heirs of Robert A. Young, who are defendants to her cross-complaint, but finds that Anna G. Young is entitled to dower of one-third during her natural life.

The court found that the defendant, Lucinda Ellis, and her family took possession of the "McClain place" at the time of its purchase, under a contract with Robert A. Young, the terms of which were the same as those by which her father, Wilson Medearis, took possession of the Thomasson place, and that she and her family occupied the same for several years under such agreement, but found that said Robert A. Young, either on the 12th day of May, 1885, or at some time between the month of August, 1880, and the 12th day of May, 1885, made a gift of said farm to said Lucinda Ellis; and that said Lucinda made valuable improvements on the land in reliance upon said gift, and found that said Lucinda was entitled to have her title to the McClain place quieted against the administrator and heirs of Young; but found that the plaintiff, Anna G. Young, is entitled to a dower of one-third for life. The decree was entered according to the findings.

*E. S. McDaniel,* for appellants; *Harry S. Stokes,* of counsel.

1. The burden is on appellees to establish their title by clear and conclusive proof.

Appellees. would not be entitled to a decree quieting title in them to the lands as against the appellants, unless they would have been entitled in the lifetime of Young to a decree against him for specific performance. A parol contract to convey land must be clearly and conclusively proved before specific performance will be decreed. 39 Ark. 424; 63 Ark. 100, which last case is controlling here. Appellees having entered and held possession in recognition of the title of Young, such possession would not justify a decree for specific performance. 44 Ark. 334; *Id.* 79.

2. A gift of property to take effect at some future date is void. 20 Cyc. 1209; 122 Pa. St. 177; 38 Pac. 640; 67 Kan. 706. See, also, 26 Pa. St. 365.

*R. J. Wilson,* for appellant; *R. Y. Nance,* of counsel.

1. If the evidence warranted the court in finding that Dr. Young made a gift of the farms to appellees, put them in possession and promised to make title to them by will or deed, and that, relying on such gifts and promises, they made valuable and permanent improvements, they were entitled to the decree quieting title in them. 32 Ark. 97; 42 Ark. 246; 43 N. Y. 34; 55 Ill. 514; 44 Md. 617; 32 W. Va. 463. Where a donor permits the donee to treat the agreement as binding and to do positive acts based on such assumption, it would be a fraud in the donor to repudiate his promise and set up the statute of frauds as an obstacle in the way of its completion. 32 Ark. 97; 42 Ark. 247; 5 L. R. A. 323, and notes; 9 Peters, 204. Appellants, being strangers to the transactions between Dr. Young and appellees, can not plead the statute of frauds. 8 Am. & Eng. Enc. of L. 659; 4 N. E. 281; 105 Ind. 17; *Id.* 105.

2. If Dr. Young was seized of an estate of inheritance in the lands at any time after his marriage, but was not so seized at the time of his death, the widow would be entitled to a dower of one-third. Kirby's Digest, § 2709. The court having so decreed, the widow can not complain.

Wood, J., (after stating the facts.) First. A careful consideration of the testimony as a whole convinces us that Dr. Young intended at some time to give appellees the lands respec-

tively claimed by them, but that he died without effectuating his purpose.

1. Appellees ask for the specific execution of a parol gift of lands, and the causes must be treated as if Dr. Young were living and the appellees were seeking to compel him to make them deeds. *Meigs* v. *Morris,* 63 Ark. 100. Would the evidence warrant such relief? Robert Medearis first suggested the idea to Dr. Young of providing a home for his father, but he says: "I did not ask my uncle to give the farm absolutely to my father, but to give it to him as a home to occupy and have the use of." He further says: "My father and sister, Julia Crawford, saw every letter I received from Mr. Young with reference to this business. They understood that they were to keep the taxes paid and keep the place in repair, and were to have all the proceeds of the farm. The 'McClain farm' was bought on the same conditions that the Crawford farm was bought." "Mrs. Ellis fully understood before she went on the place that they were to go on the farm, have all the proceeds and were to pay the taxes and keep up the repairs." This testimony is certainly corroborated by the letters of Dr. Young to Robert Medearis showing the purpose for which the "Thomasson place" was purchased, and the character of the tenancy under which it was entered and held. The "McClain place" was bought and held upon the "same conditions." This evidence shows that appellees entered into the possession and held the lands claimed by them in recognition of and in subordination to the title of Dr. Young. It reveals that the purpose of Dr. Young was to retain the title to the property while giving to his kindred the use and enjoyment of the proceeds thereof. Such at least was his understanding at the time the purchases were consummated and the possession of appellees taken, and such also must have been the understanding of appellees. If not, there was no understanding or agreement about it clearly and conclusively proved.

Equity, upon such state of facts, will not grant a remedy of specific execution. *Moore* v. *Gordon,* 44 Ark. 334; *Sutton* v. *Myrick,* 39 Ark. 424. See, also, *Fielder* v. *Warner,* 78 Ark. 158.

2. Although Dr. Young intended, at the time he purchased the farms in controversy and put appellees in possession, to retain the title in himself while allowing appellees the use thereof,

does the proof show that he afterwards changed his mind, and that he made a parol gift to appellees which should now be enforced? In letter of November, 1884, to Mrs. Crawford, Dr. Young says: "You may consider it yours at the death of your father." He also adds: "But when I write my will, if there should be another daughter, your sister, unprovided for, I shall include her in the gift." This letter shows that at this time he had not renounced dominion over the property. In 1895, Dr. Young told Mrs. Crawford that the place was hers; that "the deeds had been made out, and he had them in a tin box at home;" and in 1896, after she had made some improvements on the place, he told her that he was glad of it, that the place was hers, and he wanted her to be comfortable on it. In letters to Mrs. Ellis prior to 1877 Dr. Young wrote of his desire and purpose to purchase her a "home all of her own," and after the "McClain farm" had been purchased and she had gone into possession, as late as 1885 and again in 1895, in letters to Mrs. Ellis, writing of the farm he designates it "your farm," "your place." On June 13, 1901, Dr. Young filed in the United States District Court a schedule of assets purporting to contain all his estate real and personal, duly verified, in which he did not list the farms in controversy. This schedule and the expressions in his letters above set forth tend most strongly to show that at this time Dr. Young had renounced all ownership of the farms in controversy. If this were all, we should feel constrained to say that he had made a parol gift of these farms to appellees. But in a letter written to Mrs. Ellis he says: "Your deeds are in no danger, yours and Julia's. They are in safe hands in Cincinnati Valley. At a proper time new deeds will be made out." This letter was without date, but it was evidently when he was in the midst of the financial troubles which were causing him to go into bankruptcy. For in the same letter he speaks of an offer to compromise without law-suit, upon his payment of six thousand dollars. The above letter was written after the letter of February 22, 1901, to Robert Medearis, for he speaks of their deeds as being "in safe hands," etc.

In the letter in which he sent the deeds (February 22, 1901) he instructs his nephew to "quietly hold these" until he instructed him "what to do with them." In another letter to Robert Me-

dearis, also without date, but evidently after the letter to Mrs.
Ellis in which he mentioned the proposition for compromise, he
says: "I accepted and paid the cash ($6,000) without mortgag-
ing a grain of sand either in Tennessee or Arkansas." These
letters contain the last expressions of Dr. Young concerning
the lands in controversy. Robert Medearis testified that, after
the receipt of the letter containing deeds and instructing him to
hold same until further instructed, he received no further instruc-
tions.

It therefore appears from these last letters and this testi-
mony that Dr. Young died retaining the ownership and control
of the lands. These deeds were not delivered; he reserved the
power to further instruct his agent "what to do with them." He
said new deeds would be made, thus reserving the power to con-
vey in the future, but he never made them, and "death took him"
before the final act was performed passing the title from him
to his beloved kindred in Arkansas.

3. But, if we are mistaken in the facts, and there was a
parol gift, will equity, under the proof, enforce it? "A parol
gift of land," says Prof. Pomeroy, "will not be enforced unless
followed by possession and by valuable improvements made by
the donee, or unless there are some other special facts which
would render the failure to complete the donation peculiarly in-
equitable and unjust.

"This rule however, has no connection with the statute of
frauds. In order to grant its remedy of a specific execution,
equity requires a valuable consideration—it never enforces a
voluntary agreement. * * * The doctrine therefore has been
generally accepted that, when the donee takes possession and
makes outlays upon valuable and substantial improvements in
execution of the donation, or does other analogous acts which
would render a revocation or refusal to complete inequitable, a
parol gift of land will be specifically enforced, since the labor and
expenditures of the donee supply a valuable consideration, while
the possession and betterments constitute a part performance
which obviates the statute of frauds." Pom. Spec. Perf. Cont.
(2 Ed.), § 130, and many cases cited in note. *Guynn* v. *Mc-
Cauley,* 32 Ark. 97; *Freeman* v. *Freeman,* 43 N. Y. 34; *Kurtz* v.
*Hibner,* 55 Ill. 514; *Hardesty* v. *Richardson,* 44 Md. 617; *Frame*

v. *Frame,* 32 W. Va. 463, 5 L. R. A. 323, all cited in able brief for appellees. "Slight and temporary improvements, or trivial outlays, however, do not raise an equity in favor of the donee to have the gift enforced. * * * The gift must be established by certain and unmistakable evidence, and the fact that the improvements were made in consequence of and in reliance upon it must also be directly and unequivocally proved; proof merely that the donee has received possession of the land, and has made improvements upon it, will raise no presumption of his purpose and intent, nor furnish a sufficient ground for the specific equitable relief." Pom. on Spec. Perf. Cont. 131.

Appellee Julia Crawford and her father took possession of the land she claims in 1874. These suits were begun in June, 1903. Appellee, Mrs. Ellis, took possession in 1877. The improvements put upon the land by Mrs. Crawford were estimated by her brother Robert Medearis to cost about $200, and those placed upon the lands by Mrs. Ellis were shown to have cost a little more than $500. The rents of the farm occupied by Mrs. Ellis were about $100 per annum. It will thus appear that these improvements extend through a period of more than a quarter of a century. A majority of the court are of the opinion that these improvements are hardly of that valuable and permanent character that would render it inequitable to refuse appellees the relief prayed on account of them. The fact that the rents or the proceeds from the use of the premises greatly exceeded the cost or value of the improvements should not perhaps be made a distinct ground for the refusal to execute a parol gift. *Young v. Overbaugh,* 39 N. E. (N. Y.), 712; *Moyer's Appeal,* 105 Penn. St. 432; *Wooldridge* v. *Hancock,* 6 S. W. Rep. 818. But certainly such fact should be considered in determining the nature and extent of the alleged improvement, and in testing the alleged grounds for equitable interposition. See Pomeroy, Spec. Perf. Cont. § 131 and *Moore* v. *Gordon,* 44 Ark. 334.

The court is of the opinion that the possession of appellees and the improvements made by them would not, under the evidence, entitle appellees to compel Dr. Young, if he were living, to make them deeds to the lands in controversy. Equity must deal with his estate and his heirs as it would have dealt with him.

The decree is reversed, and the cause is remanded to the

chancery court of Washington County with directions to dismiss the cross-complaints for want of equity, and to enter a decree for appellants assigning dower to Mrs. Anna G. Young according to the statute in such cases and giving the possession of the remainder of the lands, described in the exhibits to complaint, to the administrator of the estate of Dr. Young and to proceed in manner not inconsistent with this opinion.