Akins *v.* Heiden.

Opinion delivered May 28, 1928.

*W. A. Singfield*, for appellant.

*Carmichael & Hendricks* and *McMillen & Scott*, for appellee.

HART, C. J., (after stating the facts). It is first earnestly insisted that appellants were not entitled to maintain their cross-complaint because there is not sufficient proof that they were heirs at law of Sam Summers, who originally owned the property involved in this controversy. We do not agree with counsel in this contention. While there are contradictory statements in the testimony of the witnesses introduced by appellants to prove their relationship to Sam Summers, we think that, when the surrounding circumstances are considered, it is fairly deducible from the evidence that Sam Summers, Peter Sullivan and the fathers and mothers of the appellants were all children of Rebecca or Fairy Bee Sullivan. It appears that all of the children of Fairy Bee Sullivan, except Peter Sullivan, were born in the State of Alabama, and were illegiti-

mate. Fairy Bee Sullivan came to Arkansas with her children and lived there with them and with her husband prior to and after 1867. Peter Sullivan was born after she came to Arkansas. All the children were recognized by Fairy Bee Sullivan and her husband, after they came to Arkansas, as their own children, although all of them, except Peter Sullivan, were children by other men. Under our statute negroes cohabiting as husband and wife and recognizing each other as such were deemed lawfully married from the passage of an act approved February 6, 1867. See Crawford & Moses' Digest, § 7040. We have construed this act to mean negroes who cohabit as husband and wife and recognize each other as such in the State of Arkansas at the date the act was passed. *Gregley* v. *Jackson,* 38 Ark. 487; *Wilson* v. *Storthz,* 117 Ark. 418, 175 S. W. 45; *Black* v. *Youmans,* 120 Ark. 209, 179 S. W. 335; and *Meekins* v. *Meekins,* 169 Ark. 265, 275 S. W. 337. As we have already seen, while there is some inconsistency in the testimony of the witnesses on this point, we are of the opinion that it fairly establishes the fact to be that Fairy Bee Sullivan and her husband recognized all their illegitimate children as their offspring in the State of Arkansas, where they were living on and prior to the 6th day of February, 1867. All the witnesses on this point were ignorant negroes, and it was to be expected that their testimony would be somewhat vague as to the dates of the births of these various children.

It is next insisted that appellants are not entitled to maintain this action because the matter of the title to the property involved in this controversy was settled by the probate of the will of Sam Summers, and that the whole matter is now *res judicata.* We cannot agree with counsel in this contention. The property involved in this lawsuit was not included in the will of Sam Summers. It is true, as contended by counsel for appellees, that there is a presumption against partial intestacy; but the will does not in any sense refer to

the property in controversy, and it is very plain from its terms that it was not intended to be included in the will. The principle of *res judicata* extends only to questions of fact and of law which were decided in a former suit or which might have been decided in that suit. *Jenkins* v. *Jenkins,* 144 Ark. 417, 222 S. W. 714, and *Howard-Sevier Rd. Imp. Dist. No. 1* v. *Hunt,* 166 Ark. 62, 265 S. W. 517.

Peter Sullivan and Lindsey Hicks contested the probate of the will of Sam Summers, but later dismissed their appeal from the order of the probate court probating the will, and this left the will admitted to probate, and, the time of appeal having expired, under the authority of *Jenkins* v. *Jenkins,* 144 Ark. 417, 222 S. W. 714, the probate of the will was conclusive as to all parties as to the property disposed of in the will. The will did not purport to dispose of the property in controversy, and no reference is made to it as being a part of the testator's estate. Hence the order admitting the will to probate did not in any manner affect the property in controversy, and any order made by the probate court with reference to it could in no sense affect the rights of the persons who claimed title to said property otherwise than as heirs or legatees of Sam Summers. In other words, the rights of third parties could not be in issue by an order admitting the will to probate.

It is next contended that the testimony of Peter Sullivan, which was introduced in part for the purpose of establishing the relationship of appellants to Sam Summers, was not competent, because at the time a guardian had been appointed for him as an insane person. The record shows that the probate court on March 2, 1925, appointed a guardian for Peter Sullivan as an insane person. In June, 1926, an order was made restoring Peter Sullivan to the management of his own affairs. His deposition was taken on June 22, 1925, in this case. It is claimed that his testimony was incompetent because at the time there was an adjudication of insanity

against him by the appointment of a guardian on March 2, 1925. We cannot agree with counsel in this contention. The deposition of Peter Sullivan was read to the chancery court, and, notwithstanding there existed an order of the probate court declaring him insane, the chancellor might give such weight to his testimony as he deemed proper under the surrounding circumstances, and upon appeal this court will give such weight to his testimony as the surrounding circumstances as to his mental condition would indicate. In this connection it may be stated that Peter Sullivan was dead at the time the case was heard in the chancery court. When his testimony is read and considered in the light of the surrounding circumstances and in view of the matters about which he was testifying, we do not think that it can be said that his testimony is not entitled to any weight. On the other hand, it shows that he knew perfectly well what he was testifying about. Of course he was an ignorant, illiterate negro, but he seemed to understand what he was doing and what he was testifying about.

We now come to a consideration of the claim of appellees to the property in question upon the evidence introduced. This court is committed to the rule that an oral gift of land is not enforceable unless there is actual possession delivered, followed by the making of valuable improvements by the donee. *Young* v. *Crawford,* 82 Ark. 33, 100 S. W. 87; *Brown* v. *Norvell,* 96 Ark. 609, 132 S. W. 922; *Murphy* v. *Graves,* 170 Ark. 180, 279 S. W. 359; and *Hunt* v. *Boyce,* 176 Ark. 303, 3 S. W. (2d.) 342.

The undisputed facts show that a house costing between $12,000 and $15,000, which rents for $160 per month, was built upon the property involved in this controversy by the Heidens, who were the grantees by mesne conveyances of Lindsey Hicks and Peter Sullivan; but the most serious question in the case is whether or not there is sufficient testimony to warrant a find-

ing that there was a parol gift of the land by Sam Summers to Peter Sullivan and Lindsey Hicks. There was a general finding by the chancellor in favor of appellees, who were plaintiffs; and the cross-complaint of appellants was dismissed for want of equity. In this view of the matter we do not know upon what theory the decision of the chancellor was based, but we presume that it was based upon the theory that there was an oral gift of said lot 2, which is in controversy in this case, by Sam Summers to Peter Sullivan and Lindsey Hicks, whom he recognized as his brothers. Sam Summers had no children of his own, and it is apparent from the testimony of Peter Sullivan and from the other evidence in the case that he recognized Peter Sullivan and Lindsey Hicks as his half-brothers. It does not appear that he had anything to do with his other half-brothers and sisters, and the fact that none of them are given anything under his will tends to show that he did not intend them to have any of his property. Of course, if he died owning lot 2, which is in controversy, they would be entitled to their share of it.

A careful consideration of the testimony of Peter Sullivan, in the light of the attendant circumstances, leads us to believe that Sam Summers gave to Peter Sullivan and Lindsey Hicks the property in controversy in his lifetime, and that Peter Sullivan accepted the gift. It will be remembered that the will of Sam Summers was executed on the 10th day of January, 1919, and that he died on the first day of the following month. Lot 2 in controversy was entirely omitted from the will. No reference whatever was made to it. The will was written by Scipio Jones. Jones testified that Sam Summers told him that Peter Sullivan and Lindsey Hicks were his only heirs. He left each of them a lot in the city of Little Rock. Sullivan and Hicks claimed to own the lot, and sold it after Summers died, upon the advice of Scipio Jones, a colored lawyer. Sullivan testified that he was not crazy. We copy from his cross-examination the following:

"Q. You say you were not crazy? A. No sir. Q. You deeded a half lot that you did not own? A. Lawyer Jones told me it was mine. Q. Do you believe everything a colored lawyer tells you? A. No sir—no lawyer. Q. You sold that fellow that lot and gave him a deed to something you did not own, but you are not willing to give him a deed to half the lot you do own? A. No sir. You see I didn't know anything about it except my brother told him it was his—brother Samuel Summers told me it was the first lot he bought in this town, and we was sitting in his house one day, the Christmas before he died, and he showed me where the lines of that property ran—how far it ran in his house. He told me this property would fall to his estate. Brother Summers told me that, and after he died lawyer Jones told me it fell to me, and by him telling me that it fell to me and my brother telling me, I believed it was mine. My brother told me—I said, 'Now, brother, I don't understand about no estate. What do you mean by estate?' 'You and Bud—he called brother Lindsey Bud— Q. Samuel Summers told you the Christmas before he died that he owned these two lots? A. That lot belonged to him—that he wasn't going to will it to anybody. Q. That it was going to his estate? A. Yes sir, he said estate; and I asked him who was the estate, and he said 'You and Bud'—he meant Bud Lindsey— and Jones told me, after his death, that it belonged to me and my brother, and that is the reason I thought it was mine. Q. How much did they pay you for that lot? A. They paid us $3,700, I believe it was. Q. You got half of it? A. Yes sir."

We think it is fairly deducible from this testimony that Sam Summers intended to give this property to his two brothers, and that he did give it to them when he pointed out the lines of the property on Christmas about a month before he died. It is true that no improvements were made on the property until after the death of Summers, but we think it is fairly inferable that

Summers intended to give the property to his brothers when he pointed out the lines of it on Christmas before he died, and that Peter Sullivan accepted the gift.

This view of the matter is strengthened when we consider that, some ten days later, Summers made a will and left other lots to his two brothers, and never attempted to dispose of the lot in controversy. He disposed of all his other property by his will. He recognized Peter Sullivan and Lindsey Hicks alone of all his brothers and sisters and their children as objects of his bounty, and it would seem that he did not attempt to dispose of the lot in controversy in his will because he recognized that he had already given it to his brothers when he had pointed out the lines of the property to Peter Sullivan, and that Peter Sullivan had, under the circumstances, accepted the gift in behalf of himself and brother.

In this view of the matter there was a parol gift of the lot, followed by the making of valuable improvements on it. This, under our decisions cited above, is enforceable.

The present suit was instituted on July 18, 1924. Sam Summers had died in Little Rock, Arkansas, on February 1, 1919. His will had been admitted to probate, and the property devised under it had been taken charge of by the various legatees. Upon the advice of their lawyer, Peter Sullivan and Lindsey Hicks claimed title to the lot in controversy, and sold it to third parties, who made valuable improvements upon it. During all this time appellants made no claim whatever to the property, although it is inferable that they knew that Sam Summers had died, and must have known what property he owned. Thus it will be seen that all the parties recognized that Sam Summers had given the lot in controversy to his half-brothers, Peter Sullivan and Lindsey Hicks. It is fairly inferable from all the evidence introduced that he delivered the possession of this lot to Peter Sullivan when he pointed out the lines of it

on Christmas before he died, and that Peter Sullivan accepted the lot as a gift from Sam Summers to himself and his brother, Lindsey Hicks, when the lines were pointed out to him. The property at that time was unimproved and was incapable of any other delivery and possession than pointing out the lines in the manner above indicated.

To sum up, it may be said that, though expressed in varying phraseology, the general rule is that evidence necessary to establish a parol gift of land must be clear and unequivocal. *Young* v. *Crawford,* 82 Ark. 33. The statement of the donor was something more than a loose declaration of his intention or a casual conversation of his intention. As above stated, about ten days later he made a will, and devised all of his property except the lots in controversy, and told the attorney to leave it out of the will. This tended to show that the testator believed that he had already given the lot to his brothers. The conduct of the donees was equally positive and definite. Peter Sullivan took the advice of an attorney, and then, in conjunction with his brother, Lindsey Hicks, conveyed the lot to one who erected a valuable business house on it. The testimony shows that this was the desire of the testator. He had conveyed in his lifetime the north half of the lot to a person for the purpose of having a valuable business house erected on it. The deed contained an imperfect or indefinite description of the property. The grantee never carried out the intention of his grantor, but reconveyed the lot to Peter Sullivan and Lindsey Hicks, who deeded it to persons who subsequently carried out the intention of Sam Summers and did erect a valuable business house on the lot.

In conclusion, we again say that we adhere to the rule laid down in the early case of *Guynn* v. *McCauley,* 32 Ark. 97, that chancery will not decree performance of a mere voluntary agreement. But, when a donee enters into possession and makes valuable improve-

ments on the land, the money thus expended on the faith of the gift is a consideration on which to ground a claim for specific performance. This holding is in accord with that of the Supreme Court of the United States in *Neale* v. *Neale,* 9 Wall. 1, where this language is used: "And equity protects a parol gift of land equally with a parol agreement to sell it, if accompanied by possession, and the donee, induced by the promise to give it, has made valuable improvements on the property."

Peter Sullivan was a witness for appellants, and they mainly relied on his testimony to show their relationship to Sam Summers; and he, Peter Sullivan, recognized them as children of the deceased, illegitimate brothers and sisters of Sam Summers, and as entitled to a share of his estate. His testimony, as quoted above, was brought out on cross-examination, and shows clearly, when the situation and condition of the parties are considered in the light of what followed in a few days, that there was a parol gift of the lot by Sam Summers to Peter Sullivan and Lindsey Hicks, and that, induced by the belief that the lot belonged to them, they sold it to persons who erected a valuable business house upon it, in accordance with the expressed desire of Sam Summers.

The result of our views is that the decision of the chancery court was correct, and it will be affirmed.