2010 Ark. App. 12

**Frankie Yvonne WISE, Appellant,**

v.

**Walter Lloyd WISE, Jr., Appellee.**

**No. CA09–558.**

Court of Appeals of Arkansas.

Jan. 6, 2010.

Julie A. Howe, Little Rock, for appellant.

Herby Branscum, Jr., Perryville, for appellee.

DAVID M. GLOVER, Judge.

At issue on appeal of this divorce action are challenges to the circuit court's division of approximately eighteen acres of marital real property and the court's order of payment to appellee for monies spent on appellant's nonmarital real property.

Appellant, Frankie Wise, and appellee, Walter Wise, were married on October 31, 1994. They separated on May 7, 2007, and the final decree of divorce was entered on January 29, 2009. The parties had no children born during the marriage though appellant had an adult son and appellee had two adult sons. In resolving the parties' various property issues, the trial court determined that the parties had given to Donnie and Jessie Wise (Walter's sons) and to James Wallace (Frankie's son) approximately six acres each of the parties'

marital real estate. The trial court then ordered the parties to execute warranty deeds to each of the three sons to the three described parcels of property located in Perry County, Arkansas. Further, the trial court found that Frankie owed Walter $14,807.62 for repairs and monies spent on Frankie's duplex in Saline County, Arkansas. Appellant contends in this appeal that the trial court erred (1) by awarding marital property to nonparties and ordering the parties to execute the appropriate warranty deeds, and (2) by finding that appellant owed appellee $14,807.62 for expenditures made on nonmarital property. We find merit in portions of each argument and therefore affirm in part and reverse in part on each issue.

### Standard of Review

We review domestic-relations cases de novo on the record, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Ransom v. Ransom*, 2009 Ark.App. 273, 309 S.W.3d 204. A circuit court's finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with a definite and firm conviction that a mistake has been committed. *Id.* We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Id.*

### I. *Summary of Testimony*

#### A. Real property

Frankie Wise testified that there was a mortgage on the marital home and the four or five acres "that it sits upon"; that there was no mortgage on the eighteen to nineteen acres adjacent to the house; that she and Walter owned those acres; that she had not signed any deeds conveying those acres to anyone else; that neither had she signed a contract promising to convey it to anyone else; that no one else had an ownership interest in those acres; that Donnie Wise and Jessie Wise, Walter's sons, lived on the property; and that the plan was for Donnie, Jessie, and her son, James, to inherit the property if she and Walter still owned it at their deaths. In light of the divorce action, she stated that she was asking the court to sell all the property, including the house and its four to five acres, pay off the mortgage on it, and split the proceeds between her and Walter.

On cross-examination, Frankie explained that she and Walter bought the land in 1996 and that they refinanced it in 2005; that when they refinanced it, they mortgaged only four acres, leaving about nineteen acres; that those nineteen acres were the acres Donnie and Jessie were living on; that Donnie had lived there about nine or ten years and Jessie about two years; that her son, James, was in the service; that it was not a fact that she and Walter had agreed for each of the boys to have six acres; that they had hoped they would be able to leave them those acres after death; that it was Walter's idea to let them move onto the land and put mobile homes on it; that there was already a road to Donnie's mobile home; that they had "to put in a road in the middle of the land because the boys kept driving down to the field and tearing, rutting up the field [and] we were always going down to the creek for swimming and cookouts and stuff"; that Walter built the road; that electricity was "put to each of the three plots"; that "Walter took our marital money and did that"; that Donnie picked the westernmost plot near the Big Maumelle River; that Jessie's house was on the middle plot, near the Big Maumelle River; that her son, James, was going to get the easternmost part of this property as an inheritance when she and Walter died; and that the property was

never deeded because she never consented to turn over the deed.

On redirect (reviewing Walter's Exhibit 4), Frankie testified that she had never before seen any plat or map prepared by a professional with the names of the three boys on it; that Walter had asked her to sign a deed to the children, but she had refused; and that it was a "hot point of contention" in their marriage.

Walter Wise testified about the real property. He said that he and Frankie remortgaged the acreage in 2005 "because we had given the boys six acres each"; that after the refinancing, the house and four acres was all that was covered by a mortgage; that Frankie agreed to it; that he and Frankie "agreed to give each one of [the boys] approximately six acres each"; that the only stipulation was they could not have their other parent live there; that if the land changed hands, it had to be among the three; that this was discussed between James, Donnie, and Jessie; that they picked out the parcels they wanted; that Donnie has lived there almost ten years; that he has water, power, and a septic system; that Jessie has lived there almost three years and has water and power; that there's water for James and a driveway to James's property; that James is serving his country in Germany, but that if he chooses to live on the property, there's already power and water available; that he (Walter) "did that for them"; that the boys helped; and that he (Walter) built these driveways to the property, put power to the property, and also put septic tanks in for them.

On redirect, Walter explained,

Donnie has been living on his part of this land for I think it will be ten years in a couple of months. He did the survey prior to him moving on it. And he ran the lines and put up stakes. Donnie knew what part he was getting, and then two or three years ago, when Jessie moved on, he knew what part he was getting. And then James knew ten years ago or sometime that his was already plotted out, too. And the surveyor had never made a plat of it until a year or so ago although he had drawn a sketch of it. He was going to plot it out when we turned it over to the boys individually and titled it to them. He had that stuff already in his file. I asked him then to give me the actual descriptions, since we were coming to court, after Ms. Wise changed her mind about doing this. I wouldn't have gone down there and put driveways to three different plots and had stakes put up, had water put to it and electricity unless I was going to let the boys have it. It was a lot of expense.

Dale Boyette testified that he knows Walter's two sons, Donnie and Jessie, and Frankie's son, James; that on several occasions, the subject would come up and "it was always agreed that where that property is would be Donnie's, Jessie's, and James' "; that he did not know the details; that Donnie and Jessie have actually set up households on some of that property; and that they have electricity, driveways, water, and septic tanks.

Donnie Wise testified that he moved his mobile home on to his six acres in 1999; that he knew where his six acres were; that his brother now lives down there, too; that he believed the land had been surveyed and platted even before he moved onto it; that he knows where his lines are; that it's been staked; that there's a driveway to his land and to Jessie's land and a driveway off the road to James's land; that all three parcels have water and electricity; that he had heard "Walter and Frankie discuss the fact that they were going to deed that property to me and it was going to be mine"; and that he would

not have moved there and set up a mobile home and made all the improvements if he had known he was not going to get that land. He acknowledged on cross-examination that he had never received that deed.

Jessie Wise testified that he had lived on the land for about two years; that he had a road to his land, water, electricity, and a septic tank; that he has established a mobile home on it; that he would not have done that if he thought it was not going to be his land; that he had heard Walter and Frankie discuss that the land he was to receive would be deeded to him; that they had all three heard that they would get their acres some nine years ago; that he has spent money out there in addition to putting in water, electricity, and a driveway; and that he has made improvements, put up other buildings, and set up a yard and a shed.

On cross-examination, Jessie stated that his mobile home was movable; that he, not his dad, had personally paid to put in the electricity; that he had paid to have the poles set when he first moved in; that the septic tank was around $500; that he had paid for it; that they used Walter's equipment to dig the hole to put the tank in; that Walter paid for some of it; that Walter helped him out with the water line; and that Walter did not pay for every single thing, but that he did pay some and helped out.

James Wallace testified that the property was not actually given to them; that it was his understanding that the property would eventually be theirs when Frankie and Walter passed away; that Frankie and Walter never promised him that they would never sell their land before they died; and that he knew if they sold the land before they died, he would not get the six acres.

On cross-examination, James said that getting some of the land had been dis-cussed for about twelve years; that Donnie and Jessie had actually put mobile homes on the land; that he did not remember "any stakes getting put up"; that the property was broken down into lots but he did not know of any stakes; and that he understood that he, Donnie, and Jessie would eventually get the property when Frankie and Walter died.

## B. Duplex

Frankie Wise testified that she purchased the duplex in 1989, prior to the marriage; that her monthly note payment on it was $368.59; that over the years Walter had "helped a lot as far as evaluating what needed to be done, occasionally buying some painting supplies"; that Walter did not contribute any funds for substantial improvements; and that she was short $500 on the last repairs to the duplex and Walter gave her that amount to give to the contractor.

On cross-examination, she stated that Bobby Stokes was the man from whom she was buying the duplex; that Walter was making those payments to Stokes because Walter's daughter and family were living in her (Frankie's) duplex, and Walter was buying a truck from the son-in-law; that instead of charging them rent on the duplex, Walter purchased the truck and made payments on the duplex in exchange; that when Walter wrote a check for having the duplex yard mowed, for instance, she always paid him back—"Always. And I paid cash." Frankie stated that she objected to the introduction of Walter's Exhibit 6, which was a bundle of checks; she stated that she did not dispute that "Walter paid Jason Hunt for something, but it wasn't for the work that was done on my duplex"; and that "it was probably when we had them remodel the floor—we had some repair work in our bedroom."

In reviewing Walter's Exhibit 6, Frankie addressed each of the checks and explained that she and Walter had the remodeling work done on their house in the kitchen and the bedroom; that James Higgins did the kitchen work and Jason Hunt did the bedroom; that Walter also had James Higgins build two buildings "down by Donnie and Jessie's trailer"; that Walter often paid Lloyd Wedge to mow the yard at her duplex, but she would repay Walter; that several checks were not payable to anyone and she did not know what they were for; that she had no reason to believe they were an investment in the duplex; that some of the checks were probably related to the bedroom remodel; that one of the checks was to Hank's Fine Furniture for $2,199.77, which was for a bedroom suite Walter bought her; that the checks to Bobby Stokes, deposited directly to his bank account, were for rent and corresponded to the time that Walter's daughter lived in Frankie's duplex.

During his testimony on redirect, Walter testified, "I paid Bobby Stokes, Jim Johnson, and Jason Hunt, some $14,807 for work done on [Frankie's] duplex."

## II. *The Trial Court Erred by Awarding Marital Property to Nonparties*

### A. Gift/Promise to Convey

█ It is undisputed that there is no deed conveying the property to the parties' three sons or any written agreement to convey the property to them. The trial court determined that appellant and appellee had given each of the three sons six acres, that Donnie had lived there about ten years, Jessie about three years, and that improvements had been made to all three parcels. She concluded therefore that the parties' sons were entitled to the property and ordered the parties to execute separate warranty deeds to the three of them.

We find the evidence in this case to present a close question. But, giving due deference to the trial court's determinations of credibility, we are not left with a definite and firm conviction that the trial court erred in finding that the parties had made a gift of the three six-acre parcels each to Donnie, Jessie, and James. The trial court clearly did not credit Frankie's version of events.

In *Young v. Crawford*, 82 Ark. 33, 45–46, 100 S.W. 87, 91 (1907), our supreme court explained,

"A parol gift of land," says Prof. Pomeroy, "will not be enforced unless followed by possession and by valuable improvements made by the donee, or unless there are some other special facts which would render the failure to complete the donation peculiarly inequitable and unjust. "This rule however, has no connection with the statute of frauds. In order to grant its remedy of a specific execution, equity requires a valuable consideration—it never enforces a voluntary agreement. . . . The doctrine therefore has been generally accepted that, when the donee takes possession and makes outlays upon valuable and substantial improvements in execution of the donation, or does other analogous acts which would render a revocation or refusal to complete inequitable, a parol gift of land will be specifically enforced, since the labor and expenditures of the donee supply a valuable consideration, while the possession and betterments constitute a part performance which obviates the statute of frauds." "Slight and temporary improvements, or trivial outlays, however, do not raise an equity in favor of the donee to have the gift enforced. . . . The gift must be established by certain and unmistakable evidence, and the fact that the improvements were made in consequence of and

in reliance upon it must also be directly and unequivocally proved; proof merely that the donee has received possession of the land, and has made improvements upon it, will raise no presumption of his purpose and intent, nor furnish a sufficient ground for the specific equitable relief."

The *Young* court concluded that the improvements in that case, extending over more than twenty-five years, "are hardly of that valuable and permanent character that would render it inequitable to refuse appellees the relief prayed on account of them." Moreover, in *Meigs v. Morris*, 63 Ark. 100, 106, 37 S.W. 302, 303 (1896), our supreme court explained that it is "so natural for parents to help their children by giving them the use of a farm or house, and then to call it theirs, that no gift or sale of the property can be inferred from such circumstances." In a somewhat more recent vintage case, our supreme court explained,

> Furthermore, an oral gift of land is not enforceable unless there is actual possession, followed by making of valuable improvements.... The expenditures made by the donee in reliance upon the gift supply consideration, and the possession and betterment constitute such part performance as to take the case out of the statute of frauds.... The fact that the improvements were made in reliance upon the gift must be directly and unequivocally proved; mere proof that the donee received possession of the land, and has made improvements upon it, will raise no presumption of his purpose.... If the improvements made by the party can reasonably be accounted for in sortie [sic] other way than by a contract between the parties, then such possession and improvements will ordinarily not avail as a part performance.

*Hendrix v. Hendrix*, 256 Ark. 289, 295–96, 506 S.W.2d 848, 852 (1974).

Here, we have two sons moving onto property that belonged to their parent and stepparent. The "houses" on the land are mobile homes and at least one son acknowledged that his could be moved. The testimony was a bit unclear as to who paid for those improvements, but Walter at least helped. The other improvements made on the land included septic tanks, driveways, electricity, and water. The improvements were made over a period of two to nine years. We find no clear error in the trial court's determination that, under these circumstances, the property had already passed out of the marital estate and had been gifted to Donnie, Jessie, and James.

**B. Conveyance to Nonparties**

■ In this portion of her argument, appellant relies on the case of *Copeland v. Copeland*, 2 Ark.App. 55, 58, 616 S.W.2d 773, 775 (1981):

> We also agree with appellant that the chancellor erred in awarding disputed items of *personal* property to the son of the parties *who was not himself a party to the action. Third parties may be brought into, or intervene in, divorce actions for the purpose of clearing or determining the rights of the spouses in specific properties. Lance v. Mason,* 151 Ark. 114, 235 S.W.2d [S.W.] 394 [1981]. In this case neither was done. *The court might also have simply found that the disputed property belonged to neither contending spouse. The trial court had no authority, however, to award the property to a stranger to the action.*

(Emphasis added.) Likewise, in *Arnold v. Spears*, 343 Ark. 517, 522–23, 36 S.W.3d 346, 349 (2001), our supreme court stated,

As an initial matter, we take issue with how the Arnolds have framed this point. Under our Family Law Code, the chancellor in a divorce action distributes all marital property, one-half to each party, unless the chancellor finds that division to be inequitable. Ark.Code Ann. § 9–12–315(a)(1)(A) (Repl.1998). By necessity, the chancellor must first determine what comprises marital property in order to distribute it.

. . . .

The Arnolds correctly point out that we have stated, as a general matter, that a chancellor has no authority to decide the validity of an obligation to a third party who is not a party to the divorce. *See, e.g., Grace v. Grace,* 326 Ark. 312, 930 S.W.2d 362 (1996). But we do not view the chancellor's actions in this case as an impermissible effort to decide the landlord-tenant disagreement over The Hope Chest property or the rights of the Arnolds to that property as landlords under Ark.Code Ann. § 18–16–108 (Supp.1999). Rather, we view the chancellor's efforts as totally geared toward identifying and determining what is marital property. Hence, we view this argument as no basis for issuing the requested writs.

In *Hodges v. Hodges,* 27 Ark.App. 250, 258–59, 770 S.W.2d 164, 169 (1989), our court explained,

Finally, appellant argues that the court erred in awarding an automobile to the parties' daughter because she was not a party to the action. The chancellor heard testimony from both parties and the daughter regarding ownership of the automobile in question. In support of her position, appellant sets out in her brief the following language from *Copeland v. Copeland,* 2 Ark.App. 55, 616 S.W.2d 773 (1981):

We also agree with appellant that the chancellor erred in awarding disputed items of personal property to the son of the parties who was not himself a party to the action. Third parties may be brought into, or intervene in, divorce actions for the purpose of clearing or determining the rights of the spouses in specific properties. [Citation omitted.] In this case neither was done.

However, had appellant read further, the court also stated, "The court might also have simply found that the disputed property belonged to neither contending spouse."

In the instant case, the chancellor held that all property owned by the parties should be divided equally with the exception of certain property not part of this appeal, and "a Mercury automobile which, although titled in the plaintiffs name, is in truth and in fact, the property of Michelle Hodges, the adult daughter of the parties." The chancellor did not "award" the automobile to the daughter. He merely found that the property belonged to neither contending spouse. We find no merit in appellant's argument.

Finally, in *Boxley v. Boxley,* 77 Ark.App. 136, 142–43, 73 S.W.3d 19, 24 (2002), our court stated,

Appellant also contends that the judge erred in finding each party separately liable for only one-half of the debt to Ruby because he had no authority to determine the validity of a debt to a third party who is not a party to the lawsuit. *Appellant is correct that a judge has no authority to decide the validity of an obligation to a third party who is not a party to the divorce. Arnold v. Spears,* 343 Ark. 517, 36 S.W.3d 346 (2001); *Grace v. Grace,* 326 Ark. 312, 930 S.W.2d 362 (1996); see also

*Hodges v. Hodges,* 27 Ark.App. 250, 770 S.W.2d 164 (1989). *Third parties may be brought into, or intervene in, divorce actions for the purpose of clearing or determining the rights of the spouses in specific properties. Copeland v. Copeland,* 2 Ark.App. 55, 616 S.W.2d 773 (1981). *As the judge noted, Ruby did not intervene in this action. Therefore, the judge had authority only to determine Robert's and Kathy's obligations, as to each other, in regard to this debt. We stress, however, that the judge did have the authority to allocate responsibility for this debt as between the parties.*

(Emphasis added.)

The trial court clearly had authority to decide the parties' rights to the real property in question, *i.e.,* the three six-acre parcels, which were determined to be out of the marital estate as the result of gifting the property to the parties' three sons several years earlier. We have concluded that the trial court had no authority to order the parties to deed the property to the parties' three sons, who were not parties to this action, without making their sons parties to the action.

III. *The Trial Court Erred by Finding Appellant Owes Appellee $14,807.62 for Expenditures Made to Appellant's Nonmarital Property*

■ For her second point of appeal, appellant contends that the trial court erred in finding that she owes appellee $14,807.62 for expenditures made to her duplex, which is nonmarital property. We agree.

The amounts submitted by Walter in his Exhibit 6 total the $14,807.62 sum awarded to him. However, that amount includes a check to Hank's Fine Furniture for $2,199.77 for personal property, a bedroom suite. This specific expenditure is clearly not an expenditure attributable to real property, the duplex. In addition, Walter's Exhibit 6 shows fifteen checks paid to Bobby Stokes, Frankie's mortgagee, each for $368.59 and totaling $5,528.85. Frankie testified, and Walter did not dispute her testimony, that Walter made those payments during that time period because his daughter and her family were living in Frankie's duplex, and Walter was buying a truck from the son-in-law. While the trial court's inclusion of other challenged expenditures in the $14,807.62 award can be attributed to credibility determinations, the $2,199.77 payment to Hank's Fine Furniture and the $5,528.85 total sum paid to Bobby Stokes cannot. We therefore find clear error in the trial court's inclusion of these two items in the amount awarded to Walter and hold that they should be deducted, leaving a total of $7,079.00 to be paid by Frankie to Walter with respect to the duplex.

Affirmed in part; reversed in part.

VAUGHT, C.J., and MARSHALL, J., agree.